# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

**JAMEL MCKELVEY,**

       **Plaintiff,**

**v.**                                                       **Case No. 3:13-cv-22206**

**WESTERN REGIONAL JAIL;**
**MIKE CLARK, Administrator of the**
**Western Regional Jail;**
**CORRECTIONAL OFFICER HARSHBARGER;**
**CORRECTIONAL OFFICER KELLY;**
**CORRECTIONAL OFFICER GILKERSON;**
**CORRECTIONAL OFFICER BLANKENSHIP;**
**CORPORAL FARRELL;**
**LIEUTENANT ALDRIDGE;**
**CORRECTIONAL OFFICER COFFEY;**
**CORRECTIONAL OFFICER DANNY JONES;**
**CORRECTIONAL OFFICER STEPHENS; and**
**CORRECTIONAL OFFICER CHRIS CARTER,**

       **Defendants.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

On August 23, 2013, Plaintiff filed a *pro se* Complaint under 42 U.S.C. § 1983 (ECF No. 1), alleging violations of his constitutional rights guaranteed by the Fourteenth Amendment to the United States Constitution while a pretrial detainee at the Western Regional Jail ("WRJ") in Barboursville, West Virginia. Pending before the Court are six motions for summary judgment: Defendants Harshbarger and Kelly's Motion for Summary Judgment, (ECF No. 211); Defendant Blankenship's Motion for Summary

Judgment, (ECF No. 213); Defendant Aldridge's Motion for Summary Judgment, (ECF No. 215); Defendant Gilkerson's Motion for Summary Judgment, (ECF No. 217); Defendants Carter, Coffey, Farrell, Jones, and Stephens's Motion for Summary Judgment, (ECF No. 219); and Defendant WRJ's Motion for Summary Judgment, (ECF No. 221).[1] Plaintiff was notified of his opportunity to file responses, and he has responded to the motions filed by Harshbarger, Kelly, Aldridge, Gilkerson, Carter, Farrell, Jones, and Stephens. (ECF Nos. 266, 267, & 268). Along with his responses, Plaintiff submitted an extensive amount of discovery materials that he has amassed throughout the lengthy discovery process in this case, which the undersigned guided through numerous status conferences and discovery orders. Accordingly, the issues have been fully developed and are ready for resolution.

This matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth herein, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** the following:

1. The Motion for Summary Judgment filed by the WRJ, (ECF No. 221), be **GRANTED**, and Plaintiff's claim against the WRJ be **DISMISSED**;

2. The Motions for Summary Judgment filed by Defendants Harshbarger, Kelly, Blankenship, Gilkerson, Carter, Farrell, Jones, and Stephens, (ECF Nos. 211, 213, 217, 219), be **GRANTED,** in part, and **DENIED**, in part. All of Plaintiff's claims against these

---

[1] Mike Clark, the former Administrator of the Western Regional Jail, was never served with the summons and complaint in this action, and he has not filed a motion for summary judgment. Coffey was also never served in this lawsuit, but counsel has filed a motion for summary judgment purportedly on Coffey's behalf. Coffey's status is discussed in detail below. The undersigned collectively refers to those defendants who have been served and filed motions for summary judgment as "Defendants."

defendants in their official capacities should be **DISMISSED**. Plaintiff's excessive force claims against these defendants in their personal capacities should proceed to trial;

3.     The Motion for Summary Judgment filed by Aldridge, (ECF No. 215), be **GRANTED**, in part, and **DENIED**, in part. All of Plaintiff's claims against Aldridge in his official capacity should be **DISMISSED**. Plaintiff's supervisory liability claim against Aldridge in his personal capacity should proceed to trial;

4.     Plaintiff's claims against Administrator Clark and Coffey be **DISMISSED, without prejudice**;

5.     The presiding District Judge reconsider Plaintiff's motions for the appointment of counsel, (ECF Nos. 2, 200), which were denied without prejudice, to determine whether Plaintiff requires the assistance of counsel at the trial of this civil action; and

6.     That a pretrial hearing and a trial date be scheduled.

## I.     <u>Relevant Facts</u>

Plaintiff Jamel McKelvey's ("McKelvey") complaint concerns two incidents that occurred at the WRJ in September 2011 while Plaintiff was a pretrial detainee there. *See* (ECF No. 271-2 at 11) (recognizing McKelvey's status as a pretrial detainee on September 11, 2011). The first incident, involving Officer Blankenship, occurred on September 10, 2011. The second incident, involving other named defendants, occurred the following day. The undersigned summarizes the relevant events on both days as described by the parties.

### A. Plaintiff's Version of Events on September 10, 2011

McKelvey alleges that Defendant Blankenship "assaulted" him on September 10, 2011. (ECF No. 3 at 7). According to McKelvey, Blankenship was serving food trays and instructed McKelvey to "get out of the red zone [or doorway]." (*Id.*) McKelvey began to comply with Blankenship's order by stepping back, but Blankenship grabbed McKelvey's arm and took him to the ground. (*Id.*) While McKelvey was on the ground and not resisting, Blankenship kneed McKelvey in the ribs and punched him. (*Id.*) McKelvey was

then restrained after additional correctional officers arrived, and he was taken to medical. (McKelvey Dep. at 22-24).[2] McKelvey was checked in medical, but did not receive any treatment. (*Id.* at 24-25). McKelvey filed a grievance addressed to Mike Clark and Defendant Aldridge concerning this incident, but it is unclear whether McKelvey ever received any response. (ECF No. 271-2 at 10). At his deposition, McKelvey testified that he was physically "fine" after the incident, but that he felt "emotional damage" and embarrassment. (McKelvey Dep. at 23, 25).

### B. Defendants' Version of Events on September 10, 2011

Blankenship wrote in his September 10, 2011 incident report that he was conducting food service when McKelvey approached him to receive his food tray. (ECF No. 213-1 at 5). While standing in the doorway where food trays were passed out, McKelvey asked Blankenship about mail that he had been waiting on, and Blankenship informed McKelvey that he would check on the mail later. (*Id.*) Blankenship then instructed McKelvey to move out of the doorway, and McKelvey replied that he wanted his mail at that instant. (*Id.*) Blankenship commanded McKelvey to get out of the doorway several more times and then told McKelvey to "lock down in his cell." (*Id.*) When McKelvey failed to comply, Blankenship placed McKelvey in the escort position. (*Id.*) McKelvey began to yell and pull away, which resulted in Blankenship placing McKelvey on the floor using a straight arm bar takedown. (*Id.*) Other correctional officers eventually arrived, and McKelvey was subsequently placed in handcuffs and taken to medical. (*Id.*) McKelvey was checked and cleared by medical. (*Id.* at 7). Another correctional officer,

---

[2] Portions of McKelvey's deposition have been filed throughout this litigation and are found scattered under different docket numbers; however, the entire deposition transcript has never been filed. The undersigned was provided a copy of McKelvey's complete deposition transcript and, for ease of reference, cites to his testimony in this PF & R by transcript page number.

Marcum, completed an incident report that same day, similarly describing the events that occurred on September 10, 2011. (*Id.* at 2-3).

### C. Plaintiff's Version of Events on September 11, 2011

On September 11, 2011, McKelvey alleges that he was attacked by a number of correctional officers. (ECF No. 3 at 5-7). The incident began when McKelvey requested that he be taken to medical because he was experiencing chest pains.[3] (McKelvey Dep. at 72, 74). When Defendant Harshbarger arrived at McKelvey's cell to escort him to medical, Harshbarger pointed a can of mace at McKelvey's face and ordered him to put his hands on the wall. (*Id.* at 83-84). McKelvey complied by placing his hands on the wall, and Harshbarger began patting McKelvey down. (*Id.* at 85). While conducting the pat down, Harshbarger grabbed McKelvey by the neck and threw him to the floor. (*Id.*) Once McKelvey was on the ground, Harshbarger began to punch McKelvey on the left side and back of his head. (*Id.*) Defendant Kelly then entered McKelvey's cell and grabbed McKelvey's arm, threatening to break it. (*Id.* at 86). McKelvey pleaded with Kelly not to do so. (*Id.*) Kelly next punched McKelvey in the face, and Defendant Danny Jones subsequently reached McKelvey's cell with restraints. (*Id.* at 87). McKelvey continued to be punched by Harshbarger and Kelly while handcuffs were placed on him. (*Id.* at 87-88). Harshbarger then took out his mace can and sprayed McKelvey on the ear and neck when McKelvey turned his face away from the can. (*Id.* at 90). At that point, McKelvey was already handcuffed behind his back and in leg shackles, which were locked tight around his heels. (*Id.* at 91).

---

[3] McKelvey testified that he told a correctional officer that he needed to go to medical because he was experiencing chest pains as a result of previously being shot in his torso; however, McKelvey admitted that he has never been shot. (McKelvey Dep. at 72, 74-75).

McKelvey was then brought to his feet and held by other officers while Harshbarger sprayed him in the face with mace. (*Id.* at 91-92). The correctional officers in McKelvey's cell persisted in punching and kicking him. (*Id.* at 93). The officers then rammed McKelvey's head into the cell wall and door while taking him out of his cell. (*Id.*) McKelvey was escorted out of his cell and down a staircase while being assailed with racist and derogatory names by the escorting officers. (*Id.* at 94-95). On the stairs, McKelvey was punched by an officer, whom he could not identify. (*Id.* at 95). At the bottom of the stairs, McKelvey's head was rammed into the wall. (*Id.* at 95, 100). Subsequent to descending the stairs, McKelvey was held on his left by Harshbarger and on his right by Kelly. (*Id.* at 100). Defendant Coffey was also present at that point. (*Id.* at 99). After entering into the hallway at the bottom of the stairs, McKelvey was tripped and slammed to the ground by Harshbarger. (*Id.* at 100-01). McKelvey's mouth hit the floor, and his mouth began to bleed. (*Id.* at 103). McKelvey exclaimed that his teeth had hit the floor, which caused his front two teeth to break, and the officers picked him up from the floor and continued to escort him down the hallway. (*Id.* at 104, 115). During the trek down the hall, Defendant Gilkerson kicked McKelvey "in the butt" repeatedly, and another correctional officer sprayed McKelvey with mace on his exposed bottom. (*Id.* at 104-05). McKelvey heard Defendant Farrell instruct the other officers to take McKelvey to medical, and Defendant Carter positioned himself on the side of McKelvey to assist in the escort. (*Id.* at 106). Before entering medical, Harshbarger punched McKelvey in the stomach once more. (*Id.*)

In medical, McKelvey informed the nurse that the officers had knocked his teeth out. (*Id.* at 107). Carter then left the room, and the nurse went to collect medical supplies. (*Id.*) While the nurse was gone, Farrell instructed McKelvey to bend over the examination table, and McKelvey complied. (*Id.* at 108). Farrell held McKelvey down on the table while

Harshbarger punched McKelvey four times in the face. (*Id.* at 108-09). The nurse subsequently returned and took photographs of McKelvey's injuries. (*Id.* at 110). The nurse also wiped McKelvey's mouth. (*Id.*) Carter took McKelvey to the showers so that he could wash off the mace. (*Id.* at 111-12). Later, a doctor arrived and stitched up McKelvey's lip. (*Id.* at 114). The following morning, McKelvey saw Administrator Clark and Aldridge, and he reported to them that the officers had knocked his teeth out. (*Id.* at 115). They both replied that they would "check the paperwork" regarding the incident. (*Id.*) McKelvey subsequently had his front two teeth filed down and crowns were placed on them. (*Id.* at 132).

### D. Defendants' Version of Events on September 11, 2011

#### 1. Correctional Officer Chapman's Incident Report

On September 11, 2011, Correctional Officer Chapman (a dismissed defendant in this action) completed an incident report related to his interactions with McKelvey that day.[4] (ECF No. 211-1 at 8). McKelvey notified Chapman, who was working in the control tower on September 11, that he had been shot in his torso before being incarcerated, that the bullet was still lodged inside of him, and it was causing him extreme chest pain. (*Id.*) Chapman notified medical and Farrell of McKelvey's complaints. (*Id.*) Shortly thereafter, Harshbarger arrived at McKelvey's cell to escort him to medical. (*Id.*) Harshbarger instructed McKelvey to place his hands and cheek on the wall for a pat down. (*Id.*) Chapman heard McKelvey cursing at Harshbarger, and upon looking at the control podium video screen, observed Harshbarger perform a straight arm bar takedown on McKelvey. Chapman called for officer assistance at 2:40 p.m., and several correctional

---

[4] Some of the following facts are taken from the incident report written by Chapman, which was provided to the plaintiff and the Court, but was not filed.

officers responded, including Kelly, Jones, Carter, Coffey, Stephens, and Farrell.

### 2. Harshbarger's Incident Report

Harshbarger reported that on September 11, 2011, he was instructed by Farrell to take McKelvey to medical at approximately 2:35 p.m. (ECF No. 211-1 at 5). Upon arriving at McKelvey's cell, Harshbarger instructed McKelvey to place his hands and left cheek on the wall for a pat down. (*Id.*) McKelvey put his hands on the wall, but refused to press his cheek to the wall. (*Id.*) Harshbarger commanded that McKelvey comply with his previous order, and McKelvey again declined. (*Id.*) Harshbarger placed McKelvey's cheek against the wall and told him to stand still. (*Id.*) McKelvey immediately threw his body backwards, and Harshbarger took McKelvey to the floor using a straight arm bar takedown. (*Id.*) Harshbarger struggled to gain control of McKelvey, who Harshbarger described as belligerent, as McKelvey refused to place his hands behind his back. (*Id.*) Additional officers arrived at McKelvey's cell and aided Harshbarger in gaining control over McKelvey, who was still attempting to free himself from Harshbarger's grasp. (*Id.* at 5-6). Defendant Stephens sprayed McKelvey with mace, and Carter placed restraints on McKelvey. (*Id.* at 6). After restraining McKelvey, Harshbarger and Coffey began escorting McKelvey to medical; however, McKelvey was uncooperative during the escort and pulled away or refused to walk. (*Id.*) McKelvey's resistance caused him and some of the escorting officers to fall to the floor. (*Id.*) McKelvey's mouth hit the floor during the fall, which resulted in an injury to McKelvey's lip and teeth, and a small scrape and bruise on Harshbarger's right arm. (*Id.*) Subsequent to the fall, officers escorted McKelvey to medical, where Harshbarger was relieved by Carter. (*Id.*)

### 3. Kelly's Incident Report

According to Kelly's report, he received an officer assistance call and was directed

to McKelvey's cell on September 11, 2011. (ECF No. 211-1 at 4). When he arrived at McKelvey's cell, McKelvey was on the ground, and Kelly assisted Harshbarger in restraining McKelvey. (*Id.*) Kelly and other officers then escorted McKelvey down the steps and into another hallway on the way to medical. (*Id.*) In the hallway, McKelvey began to pull away from the officers and resist the escort, which caused Harshbarger, Kelly, and McKelvey to fall to the floor. (*Id.*) McKelvey was subsequently taken to medical and cleared by two nurses there. (*Id.*) Kelly later received treatment for a sprained thumb, which was caused by the fall. (*Id.*)

### 4. Carter's Incident Report

Carter also received an officer assistance call and was directed to McKelvey's cell at approximately 2:41 p.m. (ECF No. 211-1 at 10). Upon arriving at the cell, Carter observed Harshbarger and Kelly fighting with McKelvey as he refused to allow his arms to be restrained. (*Id.*) Once the officers gained control over McKelvey, Carter placed him in handcuffs and Farrell placed him in leg restraints. (*Id.*) Harshbarger and Coffey escorted McKelvey out of his cell and toward medical. (*Id.*) During the escort, Carter observed that McKelvey was combative, which caused McKelvey and several officers to fall. (*Id.*) McKelvey was eventually taken to medical and placed in the recreation yard for the chemical spray decontamination process. (*Id.*) Following decontamination, McKelvey was taken back to medical and then to booking so that he could shower. (*Id.*)

### 5. Coffey's Incident Report

Coffey responded to an officer assistance call at McKelvey's cell at approximately 2:41 p.m. on September 11, 2011. (ECF No. 211-1 at 12). Harshbarger, Kelly, and Carter were struggling with McKelvey when Coffey arrived. (*Id.*) Restraints were placed on McKelvey while he was on the ground. (*Id.*) Carter and Coffey took McKelvey from the

cell and began to escort him to medical. (*Id.*) During the escort to medical, McKelvey resisted and pulled away from the officers, which caused Coffey, Carter, and McKelvey to fall. (*Id.*) After the fall, McKelvey started to cooperate, and Coffey and Carter continued to escort him to medical. (*Id.*) Once in medical, a nurse determined that McKelvey's lip would require stitches. (*Id.*) McKelvey was taken to the recreation yard for decontamination and then to booking, where Coffey and Carter placed McKelvey in the shower. (*Id.*)

### 6. Jones's Incident Report

Jones arrived at McKelvey's cell after receiving an officer assistance call. (ECF No. 215-1 at 17). He observed that McKelvey was on the floor with Harshbarger and Carter also in the cell. (*Id.*) Harshbarger and Carter secured McKelvey's arms, and Jones secured McKelvey's feet. (*Id.*) Farrell brought in leg restraints, which Jones helped Farrell place on McKelvey. (*Id.*) After the restraints were placed on McKelvey, Jones exited the cell and returned to other duties. (*Id.*)

### 7. Stephens's Incident Report

As with the other officers, Stephens responded to McKelvey's cell after receiving an officer assistance call. (ECF No. 215-1 at 19). When Stephens arrived, McKelvey was on the ground and struggling with Farrell, Kelly, Harshbarger, and other officers. (*Id.*) Stephens entered the cell and delivered several bursts of mace to McKelvey. (*Id.*) McKelvey was placed in restraints, and Stephens returned to other duties. (*Id.*)

### 8. Farrell's Incident Report

On September 12, 2011, Farrell drafted an incident report describing the previous day's events. (ECF No. 271-3 at 10-11). He stated that after Chapman notified him that McKelvey wished to visit medical, Farrell instructed Harshbarger to escort McKelvey to

medical. (*Id.* at 10). At 2:40 p.m., Farrell heard an officer assistance call over the radio and retrieved restraints. (*Id.*) He proceeded to McKelvey's cell where he saw officers struggling with McKelvey. (*Id.*) Farrell observed Stephens spray McKelvey with mace and assisted in restraining McKelvey's legs. (*Id.*) As Farrell was exiting the area, he heard officers commanding McKelvey to stop pulling away from them. (*Id.*) Farrell saw McKelvey being lifted to his feet, and McKelvey attempted to kick the escorting officers. (*Id.*) In medical, McKelvey attempted to break free from the officers and continued to kick at them for several minutes. (*Id.*) Farrell noticed that McKelvey's lip was cut and that his teeth were broken. (*Id.*) Farrell asked McKelvey what had occurred, and McKelvey responded by saying "tell them to stop hitting me!" (*Id.*) At that time, no officers were touching McKelvey. (*Id.*) Farrell took pictures of McKelvey's injuries and instructed officers to take him outside to begin the decontamination process. (*Id.*) Farrell followed up with Harshbarger to find out what happened, and Harshbarger informed Farrell that McKelvey refused to comply with his orders, which Harshbarger indicated was typical of McKelvey. (*Id.* at 11).

   *9. Gilkerson's Whereabouts at the Time of the Incident*

   On September 11, 2011, Gilkerson was assigned to suicide watch from 11:55 a.m. to 4:19 p.m. (ECF No. 217-1 at 2, 4, 6). Gilkerson observed at least two inmates on suicide watch and recorded their behavior every fifteen minutes, beginning at 12:15 p.m. and ending at 4:15 p.m. (*Id.* at 8-11). Gilkerson denies assisting in restraining or escorting McKelvey. (*Id.* at 14).

   **E. Investigation of the September 11, 2011 Incident**

   McKelvey filed three grievances related to the September 11, 2011 incident. (ECF No. 271-2 at 3-5). Aldridge responded that he was aware of the incident and that if

McKelvey would follow the rules, then he would not be involved in altercations with the staff. (*Id.* at 6). He also informed McKelvey that if he wished to pursue charges against the officers, his public defender could help him. (*Id.* at 4). Additionally, in response to McKelvey's complaint that correctional officers were antagonizing him as a result of the incident, Aldridge asserted that he would "keep [an] eye on [it]." (*Id.* at 3).

On September 16, 2011, McKelvey wrote a letter to the West Virginia Regional Jail and Correctional Facility Authority ("the Authority") explaining that he was "assaulted" by correctional officers at the WRJ on September 11, 2011. (ECF No. 271-6 at 16). McKelvey indicated that during the attack, he was punched and kicked while on the ground and sprayed with mace while he was restrained. (*Id.* at 16-17). His head was then repeatedly bashed into walls and doors, and he was slammed to the ground face first. (*Id.* at 17). After being picked up from the floor, McKelvey was punched and sprayed with mace on the way to medical. (*Id.*)

On October 5, 2011, Steven Crook, the Chief Investigator for the Authority, replied to McKelvey's letter and notified McKelvey that he would open an investigation into his complaint and interview McKelvey within three weeks. (*Id.* at 19). On December 5, 2011, Crook authored a memorandum addressed to Paul O'Dell, the Authority's Deputy Director. (*Id.* at 20-21). Crook wrote that, during his investigation, he had reviewed incident reports, inmate letters, photographs, and statements from McKelvey, McKelvey's mother, and jail personnel. (*Id.* at 20). After reviewing these materials, Crook opined that there was insufficient evidence to substantiate McKelvey's allegations. (*Id.*) During an interview, McKelvey informed Crook that he was punched forty to fifty times, kicked fifteen to twenty times, and rammed into doors or walls ten times on September 11, 2011. (*Id.*) Crook found that the physical evidence did not "support the brutality described by

[McKelvey]." (*Id.*) Crook credited the statements by various correctional officers that McKelvey fell during the escort to medical as a result of his resistant behavior. (*Id.*) He concluded that there was insufficient evidence that McKelvey's fall was due to any malicious acts by the escorting correctional officers. (*Id.* at 21).

## II.   **McKelvey's Complaint and Defendants' Motions for Summary Judgment**

On August 23, 2013, McKelvey filed a letter-form complaint indicating that he was maliciously "assaulted" and degraded by correctional officers at the WRJ on September 11, 2011. (ECF No. 1 at 1). McKelvey alleged that the attack resulted in losing his two front teeth and four stitches in his bottom lip. (*Id.*) He requested that a § 1983 action be filed on his behalf. (*Id.* at 3). On August 30, 2013, McKelvey supplemented his complaint by filing a court-approved form. (ECF No. 3). In the supplemental complaint, McKelvey expounded on the events of September 11, 2011 and specifically identified the correctional officers who participated in the attack, including Harshbarger, Kelly, Jones, Gilkerson, and Farrell. (ECF No. 3 at 5-6). McKelvey also named the WRJ, Administrator Clark, and Aldridge as defendants. (*Id.* at 5). In addition, he alleged that he was attacked by Blankenship on September 10, 2011. (*Id.* at 7). McKelvey asserted that for no apparent reason, Blankenship grabbed McKelvey by the arm, spun him around, pulled him to the ground, and then punched and kneed him while he lay, unresisting, on the floor. (*Id.*) With respect to relief, McKelvey requested that the Court institute criminal charges against the correctional officers and the jail administrators and appoint him counsel to aid him in his civil suit. (*Id.* at 6). McKelvey's complaint was served on all of the defendants except Coffey and Administrator Clark. (ECF Nos. 14, 33, 35-36, 38-39, 44, 59, 163-65). McKelvey subsequently filed Affidavits of Non-Residency or Unknown

Residency for Service by Publication wherein he asserted that he had used due diligence to ascertain the whereabouts of Coffey and Administrator Clark, but was unable to do so. (ECF Nos. 168 & 169).

On June 6, 2015, Defendants filed their motions for summary judgment and memoranda in support of their motions. (ECF Nos. 211-222). Defendants Harshbarger, Kelly, Blankenship, Aldridge, Carter, Farrell, Jones, and Stephens all argue that they are not "persons" for the purposes of § 1983 because they were state officers or agents acting in their official capacities at the time of the events giving rise to McKelvey's complaint. Accordingly, those defendants contend that McKelvey cannot assert claims under § 1983 against them, as the statute prescribes lawsuits only against persons. Those defendants also claim that they are shielded from liability based on qualified immunity. Aldridge avers that McKelvey has failed to identify any hiring, training, or supervision statute or regulation that Aldridge violated, and the remainder of the defendants maintain that they properly exercised their discretion in using force to control McKelvey, who they perceived to pose a threat to their safety. Additionally, Gilkerson maintains that he was not present during the September 11, 2011 incident; rather, Gilkerson asserts that he did not leave his post at suicide watch. (ECF No. 218 at 2-3). Finally, the WRJ argues that it is not "person," and therefore, it is not subject to suit under § 1983. (ECF No. 222 at 3). Moreover, the WRJ insists that it is entitled to Eleventh Amendment immunity and qualified immunity. (*Id.* at 3-7).

On June 9, 2015, the undersigned issued a *Roseboro*[5] notice informing McKelvey that he possessed the right and obligation to file a response to Defendants' motions for

---

[5] *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).

summary judgment. (ECF No. 223). McKelvey was given thirty days from the date of service of the motions to file his response. (*Id.*) On August 12, 2015, at McKelvey's request, the undersigned extended the deadline to respond until October 23, 2015. (ECF No. 237 at 3). On October 1, 2015, the undersigned extended the response deadline to November 10, 2015 on account of McKelvey receiving additional discovery material from Defendants. (ECF No. 260 at 4). On November 10, 2015, again at McKelvey's request, the undersigned ordered McKelvey's response was due by December 4, 2015. (ECF No. 265).

McKelvey's responses were filed on December 11, 2015. (ECF Nos. 266-68). In response to Harshbarger and Kelly's motion for summary judgment, McKelvey asserts that both officers were present in his cell on September 11, 2011 when he was attacked. (ECF No. 267 at 2). McKelvey argues that this lawsuit in not the first time that Harshbarger and Kelly have been accused of attacking an inmate. (*Id.*) In response to Harshbarger and Kelly's assertion that they are not persons under § 1983, McKelvey contends that he is suing all of the defendants in both their official and individual capacities. (*Id.* at 3). With respect to Harshbarger and Kelly's qualified immunity position, McKelvey insists that both defendants violated clearly established laws and acted unlawfully when they "overstep[ped] the boundaries and scope of the oath they have taken to be an officer of the state." (*Id.*) In particular, McKelvey asserts that Harshbarger has previously been involved in altercations with inmates where he made similar claims that the inmates pulled away or "came off of a wall." (*Id.* at 5). McKelvey maintains that Harshbarger's incident report is inaccurate and untruthful. (*Id.*) As for Kelly, McKelvey asserts that the officer was present from the time of the officer assistance call until he was in medical and that Kelly's description of the incident is not sufficiently detailed. (*Id.* at 6). McKelvey also claims that Kelly has been sued for the use of excessive force before.

(*Id.*)

In response to Gilkerson's motion for summary judgment, McKelvey notes that he named Gilkerson in his complaint because he saw Gilkerson kick him during the escort to medical. (ECF No. 266 at 2, 4). McKelvey insists that the lack of any incident report from Gilkerson is not convincing evidence that Gilkerson was not present during the attack since McKelvey observed other (unnamed) officers during the incident who did not write reports. (*Id.* at 2). Additionally, McKelvey claims that Gilkerson's assignment to suicide watch in pod F7 allowed him to respond quickly to the officer assistance call in pod A because the two pods are next to each other. (*Id.*)

As to Aldridge's motion for summary judgment, McKelvey argues that, prior to the September 11, 2011 incident, he filed multiple grievances with Aldridge complaining of officers' assaultive, threatening, and harassing behaviors, but Aldridge failed to put a stop to his employees' misconduct. (*Id.* at 2). McKelvey contends that Aldridge was aware that inmates were being attacked, yet, he failed to prevent the beatings from occurring. (*Id.*) Rather, according to McKelvey, Aldridge assisted in covering up the attacks or attempted to rationalize his employees' unconstitutional behavior. (*Id.* at 4).

With regard to Farrell, Jones, Stephens, and Carter, McKelvey generally claims that all of these defendants "assaulted" him and violated his constitutional rights during the September 11, 2011 incident. (ECF No. 268 at 1). McKelvey claims that these officers have been accused of attacking inmates and sued for civil rights violations in the past. (*Id.* at 2). Moreover, McKelvey maintains that these officers have lied in past incident reports. (*Id.*) As for the actions of specific officers, McKelvey asserts that Carter was "involved in all claims of assault from [the] beginning to the end." (*Id.* at 5). McKelvey claims that Carter was "involved" in the attack inside his cell and the escort. (*Id.*) Further, McKelvey

insists that Carter failed to intervene when he was struck by other officers in medical. (*Id.*) With respect to Jones, McKelvey maintains that Jones was "involved" in the attack that occurred in the cell, and if Jones was not directly involved, then he failed to intervene to prevent the "assault" from continuing. (*Id.* at 6). In relation to Stephens, McKelvey claims that Stephens participated in ramming his head into the walls and excessively administered mace while McKelvey was fully restrained. (*Id.*) Additionally, McKelvey asserts that Stephens failed to intervene and stop other officers from attacking him. (*Id.*) As for Farrell, McKelvey states that Farrell was present in the cell when he was punched, kicked, and rammed into the walls and windows. (*Id.* at 6-7). McKelvey also asserts that Farrell was present in medical. (*Id.* at 7).

Overall, McKelvey argues that he has supplied ample evidence to reach a jury on his claims against Defendants, including photographs of his injuries, grievances related to both incidents, letters to the Authority reporting officer misconduct, and personnel records for certain defendants. (*Id.* at 4). McKelvey also asserts that Defendants' discovery responses to requests for admission and interrogatories are contradictory, which he believes creates a genuine issue of material fact. (*Id.*) Finally, McKelvey relies on an affidavit provided by Jermaine Johnson, a fellow inmate at the WRJ on September 11, 2011. (*Id.*; ECF No. 226 at 1). In his affidavit, Johnson states that he saw Harshbarger, Kelly, and several other officers enter McKelvey's cell on September 11, 2011. (ECF No. 226 at 1). Johnson then heard yelling and cursing, and he observed the officers punching McKelvey in the sally port and "banging his head on the glass." (*Id.*) The officers continued to "slam" McKelvey's head into nearby glass and strike him even though he did not appear to be resisting. (*Id.*) According to Johnson, Kelly later told him that "McKelvey had to get his ass kicked." (*Id.*)

### III.    <u>Relevant Legal Principles</u>

McKelvey has filed his complaint pursuant to 42 U.S.C. § 1983, which provides a remedy to parties who are deprived of federally protected civil rights by persons acting under color of any state "law, statute, ordinance, regulation, custom, or usage." Congress enacted § 1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape,* 365 U.S. 167, 171-172, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). In order to maintain a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must show through factual allegations that he was (1) deprived of a right secured by the Constitution or laws of the United States, and that (2) the deprivation was committed by a person acting under color of state law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

The court is required to liberally construe *pro se* complaints, like the one filed by McKelvey. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). However, even under this less stringent standard, the complaint still must contain sufficient factual allegations to support a valid legal cause of action. The court may not rewrite the pleading to include claims that were never presented, *Parker v. Champion*, 148 F.3d 1219, 1222 (10th Cir. 1998), develop the plaintiff's legal theories for him, *Small v. Endicott,* 998 F.2d 411, 417-18 (7th Cir. 1993), or "conjure up questions never squarely presented" to the court. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir. 1985).

Defendants have moved for summary judgment on McKelvey's § 1983 complaint. Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper when no genuine issue of material fact is in dispute, and the moving party is entitled to

judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and a disputed issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 501 U.S. at 248. Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The court shall "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991). Consequently, motions for summary judgment impose a heavy burden on the moving party as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.,* 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson,* 477 U.S. at 249-50).

Finally, Defendants have raised the defense of qualified immunity in support of

their motions for summary judgment. The Supreme Court has recognized that "[a] government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman*, ____ U.S. ____, 135 S.Ct. 348, 350, 190 L.Ed.2d 311 (2014).There are two prongs to the qualified immunity analysis: (1) whether "the facts that a plaintiff has alleged ... make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (markings omitted). A court may choose which prong to address first in the qualified immunity inquiry. *Id.* at 236. With respect to the latter prong, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, ____ U.S. ____, 136 S.Ct. 305, 308, ____ L.Ed.2d ____ (2015) (quoting *Reichle v. Howards*, 566 U.S. ____, ____, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012)). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate. However, the universe of existing precedent is not unlimited. Courts [within this circuit] ordinarily need not look beyond the decisions of the Supreme Court, the Fourth Circuit Court of Appeals, and the highest court of the state in which the case arose." *Harper v. Blagg*, No. 2:13-cv-19796, 2015 WL 6509131, at *5 (S.D.W.Va. Oct. 28, 2015) (citations and markings omitted).

## IV. **Discussion**

### A. McKelvey's Claim Against the WRJ

McKelvey named the WRJ as a defendant in his complaint, but failed to specifically allege any cause of action against the jail. (ECF No. 3 at 5-7). As explained above, the WRJ

has moved for summary judgment and claimed a number of defenses, including Eleventh Amendment immunity. McKelvey has not responded to the WRJ's motion for summary judgment.

The Eleventh Amendment to the United States Constitution provides, in relevant part, that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Although the Eleventh Amendment refers only to suits by citizens of other states, the United States Supreme Court has construed the Amendment to "establish that an unconsenting State is immune from suits brought in federal court by her own citizens as well as by citizens of another state." *Port. Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 109 L.Ed.2d 264 (2009) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) (markings omitted). The immunity created by the Amendment protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State." *Taylor v. Ozmint*, Case No. 0:10–50–HMH–PJG, 2011 WL 286133, at *2 (D.S.C. Jan. 7, 2011) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)); *see also Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1977) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities.").

As a threshold issue, the undersigned must determine whether the WRJ is an arm of the State protected by Eleventh Amendment immunity. *See Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 227 (4th Cir. 1997) ("[B]ecause of its jurisdictional nature, a court

ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte*."). In a number of past decisions, this Court has answered in the affirmative. *Kinder v. PrimeCare Med., Inc.*, No. 3:13-31596, 2015 WL 1276748, at *2 (S.D.W.Va. Mar. 19, 2015) (dismissing the WRJ from § 1983 suit on Eleventh Amendment grounds); *Skaggs v. W. Reg'l Jail*, No. 3:13-3293, 2014 WL 66645, at *1, *4 (S.D.W.Va. Jan. 8, 2014) (dismissing the WRJ from § 1983 suit and adopting finding that the WRJ is arm of the State for Eleventh Amendment purposes); *Lewis v. Western Reg'l Jail*, No. 3:11-cv-01016, 2012 WL 3670393, at *5 (S.D.W.Va. July 24, 2012) (recognizing that "the WRJ is not a person subject to suit under § 1983"), *report and recommendation adopted by* 2012 WL 3726874 (S.D.W.Va. Aug. 27, 2012)[6]; *see also Dement v. Summers Cnty. Courthouse*, No. 5:13-cv-08899, 2015 WL 461560, at *3 (S.D.W.Va. Feb. 3, 2015) (finding that Southern Regional Jail was not subject to § 1983 suit). Thus, the WRJ is guaranteed immunity unless an exception to the Eleventh Amendment applies.

Three narrow exceptions to Eleventh Amendment immunity exist. *Lee-Thomas v. Prince George's Cnty. Pub. Sch.*, 666 F.3d 244, 248-49 (4th Cir.2012). First, the State may waive its right to immunity and consent to suit. *Lapides v. Bd. of Regents Univ. Sys. of Ga.*, 535 U.S. 613, 618, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002). Such a waiver must be express, or in other words, the waiver must be an "unequivocal statement of the state's intention to subject itself to suit in federal court." *See Regueno*, 2013 WL 1837881, at *3

---

[6] In *Harter v. Vernon*, 101 F.3d 334, 338 n.1 (4th Cir. 1996), the Fourth Circuit discussed the interplay between personhood under § 1983 and the Eleventh Amendment:

> If an official or entity is not immune from suit under the Eleventh Amendment that official or entity is a "person" subject to suit under § 1983.... The opposite is also true, if the Eleventh Amendment applies, the entity or official is not a person under § 1983.... Therefore, federal courts should approach these issues solely under the rubric of the Eleventh Amendment, and should not consider an argument of "personhood" under § 1983.

(quoting *Westinghouse Elec. Corp. v. W. Va. Dept. of Highways*, 845 F.2d 468, 471 (4th Cir.1988)) (markings omitted). Historically, the State of West Virginia has not waived its sovereign immunity in similar suits. *See Kinder*, 2015 WL 1276748, at *7; *Skaggs*, 2014 WL 66645, at *5; *Chafin v. W. Reg'l Jail*, No. 3:13-cv-01706, 2013 WL 3716673, at *4 (S.D.W.Va. July 12, 2013); *Thompson v. W. Va. Reg'l Jail/Corr. Auth.*, No. 3:13-1897, 2013 WL 3282931, at *4 (S.D.W.Va. June 27, 2013); *Meadows v. Huttonsville Corr. Ctr.*, 793 F. Supp. 684, 686 (N.D.W.Va. 1992). In this case, the WRJ has asserted the defense of immunity in its answer and its motion for summary judgment. (ECF No. 29 at 1-2; ECF No. 222 at 3). Consequently, the waiver exception does not apply to this suit.

Second, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and 'act[s] pursuant to a valid grant of constitutional authority.'" *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000)). In *Will*, the Supreme Court concluded that Congress did not have the States in mind as potential defendants when it imposed liability on "persons" under § 1983. 491 U.S. at 65. Noting that ordinary rules of statutory construction required Congress to make any alteration of the "usual constitutional balance between the States and the Federal Government ... unmistakably clear in the language of the statute," the Supreme Court observed that had Congress intended to include States as "persons" for the purposes of § 1983, it would have explicitly done so. *Id.* at 65 (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L .Ed.2d 171 (1985)). Two years later, the Supreme Court reaffirmed its holding in *Will* and explained that "interpreting the words '[e]very person' to exclude the States accorded with the most natural reading of the law, with its legislative history, and with the rule that

23

Congress must clearly state its intention to alter 'the federal balance' when it seeks to do so." *Hafer v. Melo*, 502 U.S. 21, 26, 112 S.Ct. 358, 116 L.Ed.2d 601 (1991) (quoting *Will*, 491 U.S. at 65). Thus, the law is well-settled that Congress has not abrogated Eleventh Amendment sovereign immunity in the context of a § 1983 action. *See Quern v. Jordan*, 440 U.S. 332, 340, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

As to the third and final exception, "the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004) (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)); *see also Freeland v. Ballard*, 6 F. Supp. 3d 683, 694 (S.D.W.Va. 2014) ("Pursuant to the Eleventh Amendment, a federal court may enjoin state officials to conform their future conduct to federal law, which is distinguishable from a retroactive monetary award paid from State funds."). "The *Ex Parte Young* exception is directed at 'officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings'" to enforce an unconstitutional act against affected parties. *McBurney v. Cuccinelli, II*, 616 F.3d 393, 399 (4th Cir. 2010) (citing *Ex Parte Young*, 209 U.S. at 155-56). The state officer being sued must have "proximity to and responsibility for the challenged state action" before the exception can be invoked. *Id.* Moreover, the exception "applies only to prospective relief, does not permit judgments against state officers declaring that they violated federal law in the past, and has no application in suits against the States and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (citations omitted). Because the WRJ is not a state officer, but rather a state entity or agency, the third exception to Eleventh

Amendment immunity is inapplicable. *Lee-Thomas*, 666 F.3d at 249 (recognizing that lawsuit must name state official as defendant, not state agency); *Chafin*, 2013 WL 3716673, at *5 (recognizing same); *see also Thomas v. Nakatani*, 309 F.3d 1203, 1208 (9th Cir. 2002) ("*Ex Parte Young* doctrine creates a fiction by allowing a person to enjoin future state action by suing a state official for prospective injunctive relief rather than the state itself. Even so, the Supreme Court has emphasized the importance of respecting this fiction"). Therefore, the undersigned **RECOMMENDS** that the WRJ's Motion for Summary Judgment, (ECF No. 221), be **GRANTED**, and that McKelvey's claim against the WRJ be **DISMISSED**.

### B. McKelvey's Claims Against the Defendant Correctional Officers in Their Official Capacities

With respect to the defendant correctional officers and immunity under the Eleventh Amendment, McKelvey has asserted in his responses to Defendants' motions for summary judgment that he is suing the officers in both their official and personal capacities. (ECF No. 266 at 3; ECF No. 267 at 3; ECF No. 268 at 3). However, McKelvey did not make a similar claim in his complaint. The Supreme Court has summarized the difference between official-capacity suits and personal-capacity suits: "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," while "[o]fficial-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Different defenses apply to each type of suit. For example, an official sued in his personal capacity may claim qualified immunity whereas an official sued in

his official capacity may claim sovereign immunity, to the extent that the entity which the official represents retains any Eleventh Amendment immunity. *Id.* at 166-67. Different forms of relief are also available for each type of suit. A state official sued in his official capacity enjoys the same immunity from money damages as the State, yet, a state official sued in his personal capacity cannot escape monetary liability on that ground. *Skaggs*, 2014 WL 66645, at *8 (citing *Hafer*, 502 U.S. at 25).

The determination of whether a defendant has been named in his official or individual capacity is generally made by examining "the face of the complaint." *Amos v. Md. Dep't of Pub. Safety & Corr. Servs.*, 126 F.3d 589, 609 (4th Cir. 1997), *vacated on other grounds by* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998). Nonetheless, "a plaintiff need not plead expressly the capacity in which he is suing a defendant in order to state a cause of action under § 1983." *Biggs v. Meadows*, 66 F.3d 56, 60 (4th Cir. 1995). "When a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." *Id.* at 61. In *Foreman v. Griffith*, the Fourth Circuit discussed the significance of the factors outlined in *Biggs*:

> With respect to assessing the nature of a plaintiff's claim or claims, the *Biggs* court stated that the plaintiff's failure to allege that the defendant acted in accordance with a governmental policy or custom or the lack of indicia of such a policy or custom on the face of the complaint indicates that a state actor has been sued in his individual capacity. With respect to the nature of the relief sought, the *Biggs* court also stated that the plaintiff's request for compensatory or punitive damages indicates an individual capacity suit since such relief is unavailable in official capacity suits. Finally, with respect to the course of proceedings, the *Biggs* court stated that the defendant's assertion of qualified immunity as a defense indicates an individual capacity suit, since such a defense is only available in individual capacity suits.

81 F. App'x 432, 435 (4th Cir. 2003). Ultimately, "the underlying inquiry remains whether

26

the [p]laintiff's intention to hold a defendant personally liable can be ascertained fairly." *Biggs*, 66 F.3d at 61.

Here, McKelvey did not allege in his complaint that the defendant correctional officers were acting in accordance with a government policy or custom when they attacked him during September 2011. Furthermore, McKelvey appears to be pursuing compensatory damages against the defendant correctional officers, and the only other relief that he requested in his complaint was that criminal charges be brought against the officers and the jail administration. Finally, defendant correctional officers have argued qualified immunity, yet, they have also claimed Eleventh Amendment immunity by virtue of their personhood argument. In any event, the third exception to Eleventh Amendment immunity applies only where prospective injunctive relief is sought against a state official, and McKelvey does not seek such relief in his complaint.[7] Because the correctional officers enjoy immunity from suit under the Eleventh Amendment when named in their official capacities, and no exception to Eleventh Amendment immunity exists in this case, the undersigned **RECOMMENDS** that the correctional officers' motions for summary judgment as to McKelvey's official capacity claims against them be **GRANTED**, and that any official capacity claims against the correctional officer defendants be **DISMISSED**. *See, e.g.*, *Grayson v. Schuler*, 666 F.3d 450, 451 (7th Cir. 2012) (concluding official capacity suit against correctional officer was barred by sovereign immunity); *Potter v. Deputy Attorneys Under Abraham*, 304 F. App'x 24, 27 (3d Cir. 2008) (recognizing that correctional officers acting in their official capacities are immune from suit under the Eleventh Amendment).

---

[7] Even if McKelvey had sought injunctive relief, he is no longer a pretrial detainee at the WRJ, and therefore, any claim for injunctive relief against the correctional officers there would likely be moot.

**C. McKelvey's Claims Against the Defendant Correctional Officers in Their Individual Capacities**

*1. Excessive Force*

McKelvey has alleged excessive force claims against a number of the defendant correctional officers. At the time of the September 10 and 11, 2011 incidents, McKelvey was a pretrial detainee, thus McKelvey's claims are analyzed under the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment's prohibition against cruel and unusual punishment, which applies to convicted inmates. *Bell v. Wolfish*, 441 U.S. 520, 537 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005). The Due Process Clause of the Fourteenth Amendment proscribes "the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "[N]o particular extent of physical injury is required to establish an excessive force claim under ... the Fourteenth Amendment"; rather, the amount of physical force applied is what counts. *Sawyer v. Asbury*, 537 F. App'x 283, 290 (4th Cir. 2013) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 39, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010)). The Supreme Court recently established that the amount of force inquiry for claims brought by pretrial detainees is an objective one—that is, a pretrial detainee may prevail on a claim of excessive force if he demonstrates "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, ____ U.S. ____, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). The Court listed multiple factors for lower courts to consider under this objective analysis: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem

28

at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* In adopting an objective approach, the Court rejected an argument that the measure for pretrial detainee excessive force claims should be partly subjective and governed by a "malicious[] and sadistic[]" standard. *Id.* at 2475. The Court explained that, under the Fourteenth Amendment, "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" *Id.*

However, since some of the defendants have raised a qualified immunity defense, which focuses on the law that was clearly established *at the time of the alleged unconstitutional conduct*, the undersigned necessarily recognizes that the Fourth Circuit applied a combination objective and subjective test to excessive force claims brought by pretrial detainees before the Supreme Court's *Kingsley* decision. *See Watson v. Brown*, 446 F. App'x 643, 644 (4th Cir. 2011) (applying Eighth Amendment test, which includes both objective and subjective component, to pretrial detainee's claim of excessive force); *Scarbro v. New Hanover Cty.*, 374 F. App'x 366, 369 (4th Cir. 2010) (applying malicious and sadistic standard to pretrial detainee's claim of excessive force); *Young v. Prince George's Cty., Md.*, 355 F.3d 751, 758 (4th Cir. 2004) (stating that subjective standard is used to adjudicate claims of excessive force under Fourteenth Amendment); *Simms v. Bruce*, 104 F. App'x 853, 857 (4th Cir. 2004) ("To prevail on his Fourteenth Amendment excessive-force claim, [the plaintiff] must satisfy ... both a subjective and an objective standard."); *Short v. Walls*, No. 2:07-00531, 2009 WL 914085, at *5 (S.D.W.Va. Mar. 31, 2009); *see also Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 275 (4th Cir. 2011) (explaining that qualified immunity doctrine focuses on clearly established constitutional rights at time of challenged conduct). Indeed, when analyzing pretrial detainee allegations of excessive force, the Fourth Circuit has employed the very "malicious[] and

sadistic[]" subjective test that the Supreme Court refused to give controlling weight in *Kingsley*. *See Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998). In *Taylor*, the Fourth Circuit indicated that "[t]o succeed on a claim of excessive force under the Due Process Clause of the Fourteenth Amendment, [a pretrial detainee] must show that [a] [d]efendant[] 'inflicted unnecessary and wanton pain and suffering.'" 155 F.3d at 483 (quoting *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). The Court went on to say that "[t]he proper inquiry is whether the force applied was 'in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.* (quoting *Whitley*, 475 U.S. at 320-21).[8] The subjective analysis takes a number of factors into account, including "the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted ...." *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)), *abrogated by Wilkins*, 559 U.S. at 39; *see also Wernert v. Green*, 419 F. App'x 337, 340 (4th Cir. 2011) (applying same factors to pretrial detainee's excessive force claim under Fourteenth Amendment). As to the clearly established law surrounding the objective requirement in September 2011, the Fourth Circuit analyzed whether the officer's actions were sufficiently harmful to offend "contemporary standards of decency." *Watson*, 446 F. App'x at 644 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). In *Hudson*, the Supreme Court explained the relationship between these subjective and objective requirements (in the Eighth Amendment context): "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true

---

[8] *Taylor* was abrogated by the Supreme Court's 2010 decision in *Wilkins*, which rejected the Fourth Circuit's *de minimis* injury requirement for excessive force claims brought by pretrial detainees. *See Hill v. Crum*, 727 F.3d 312, 320-21 (4th Cir. 2013).

whether or not significant injury is evident." 503 U.S. at 9. As can be gleaned from the cases cited above, at the time of the alleged misconduct here, the clearly established law in this Circuit for pretrial detainee excessive force claims included both objective and subjective components. Accordingly, the undersigned applies the combination objective and subjective test to McKelvey's excessive force claims in considering Defendants' assertion of qualified immunity below.

In addition to a direct participation theory of liability for excessive force claims, a failure to intervene theory also exists. *See, e.g.*, *Lester v. City of Gilbert*, 85 F. Supp. 3d 851, 858-59 (S.D.W.Va. 2015); *Townsend v. Owens*, No. 12-10379, 2013 WL 5816546, at *6 (E.D. Mich. Oct. 29, 2013); *Claiborne v. Blauser*, No. 2:10-cv-2427, 2013 WL 1384995, at *5 (E.D. Cal. Apr. 4, 2013); *Barnard v. Piedmont Reg'l Jail Auth.*, No. 3:07CV566, 2009 WL 2872510, at *5 (E.D. Va. Sept. 3, 2009); *Jackson v. Mills*, No. Civ.A. 96-3751, 1997 WL 570905, at *5 n.10 (E.D. Pa. Sept. 4, 1997). The Fourth Circuit recognizes such a theory and has described it as "bystander liability for law officers." *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 203 (4th Cir. 2002); *see also Thomas v. Holly*, 533 F. App'x 208, 221 (4th Cir. 2013) (recognizing theory of bystander liability for excessive force claims). This theory "recognizes that, in certain limited situations, bystanding officers are obliged to act." *Randall*, 302 F.3d at 204. The Fourth Circuit explained in *Randall* that "[t]he rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Id.* at 204 n.24. "[A]n officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* at 204 (footnote omitted). With the above standards in mind, the

undersigned addresses each of McKelvey's excessive force claims individually.

### a. Blankenship

McKelvey testified at his deposition that on September 10, 2011, Blankenship took him to the ground and struck him several times while he laid on the ground unresisting. (McKelvey Dep. at 23). Although McKelvey did not recall any physical injuries as a result of the incident, he felt embarrassed and reported experiencing "emotional damage." (*Id.*) In contrast to McKelvey's testimony, Blankenship's incident report (as well as Marcum's incident report) and his discovery responses depict McKelvey as noncompliant and resistant during the incident. (ECF No. 213-1 at 5; ECF No. 271-7 at 49). As such, Blankenship asserts that the force he used was appropriate "to control an inmate that was perceived to pose a threat," and thus, "he should not be mulcted in damages for his decision." (ECF No. 214 at 4). Blankenship argues that McKelvey has only offered "self-serving statements" while Blankenship has put forth a "third party report" from Marcum supporting Blankenship's version of events. (*Id.* at 6). Additionally, Blankenship insists that because McKelvey reported no physical injury, "he has not presented any evidence of compensable damage[s]." (*Id.* at 7).

Beginning with Blankenship's claim that McKelvey has presented only "self-serving statements," McKelvey has filed a verified complaint and testified under oath describing Blankenship's actions on September 10, 2011. Both the verified complaint and McKelvey's deposition testimony, when viewed in McKelvey's favor, are sufficient to create a genuine issue of material fact as to McKelvey's excessive force claim against Blankenship. *See* Fed. R. Civ. P. 56(c)(1)(A) (providing that portions of deposition testimony may support claim that fact is in genuine dispute); *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001) ("A plaintiff's verified complaint is the

equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint.") (citations omitted); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (recognizing that "a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."). McKelvey asserts that Blankenship took him to the ground even though he complied with Blankenship's commands and that Blankenship punched and kneed him while on the ground despite his nonresistance. Blankenship denies that McKelvey was compliant and insists that the force used was necessary to gain control over McKelvey. Clearly then, a genuine issue of material fact exists as to whether the force used by Blankenship was necessary and appropriate. Essentially, McKelvey asserts that Blankenship put him on the ground and struck him without any reason to do so. Although Blankenship might protest that he would have no reason to use force against McKelvey without provocation, that question is for a trier of fact to resolve, not a court on a motion for summary judgment. Consequently, contrary to Blankenship's contention, McKelvey has presented sufficient evidence to create a genuine issue of material fact as to his excessive force claim against Blankenship.

Turning to the qualified immunity analysis, the undersigned concludes that McKelvey has alleged sufficient facts to make out a violation of his right to be free from the use of excessive force under the Fourteenth Amendment on September 10, 2011. If McKelvey's version of events is taken as true, then the need for the use of force that day was nonexistent, and therefore, the amount of force used by Blankenship was clearly disproportionate to that required under the situation. *See Sawyer*, 537 F. App'x at 294-95 (finding officer used excessive force against detainee when officer punched detainee in

head and detainee "did not attempt any violent, unruly, or evasive act" and did not pose immediate threat to officer). Because the facts alleged by McKelvey demonstrate that his right to be free from excessive force was violated, he passes the first prong of the qualified immunity analysis.

The second qualified immunity inquiry is whether the right at issue was clearly established at the time of Blankenship's conduct. Unquestionably, as of September 2011, "it was clearly established that pre-trial detainees were protected from wanton beatings that exceeded good faith efforts to restore order." *See Simms*, 104 F. App'x at 857; *see also Wernert*, 419 F. App'x at 342 ("We have no difficulty in concluding that in May 2007, it was clearly established that an arrestee or pretrial detainee is protected from the use of excessive force.") (marking omitted); *Short*, 2009 WL 914085, at *9 (recognizing that "[t]he administration of a beating for purposes other than to restore or maintain prison security or the plaintiff's own safety violates clearly established law" and citing Supreme Court's 1992 decision in *Hudson* as clearly establishing principle). McKelvey's description of Blankenship's conduct indicates that Blankenship's actions were not taken to restore order, but solely to maliciously and sadistically cause him harm. Those allegations satisfy both the subjective and objective inquiries under the clearly established law for excessive force claims within the Fourth Circuit on September 10, 2011. Accordingly, genuine issues of material fact (e.g. McKelvey's actions prior to and during Blankenship's use of force, and the amount of force used) preclude granting summary judgment to Blankenship on qualified immunity grounds.

On the subject of damages, Blankenship argues that McKelvey was not physically injured as a result of the September 10, 2011 incident, and thus, he is entitled to summary judgment based on McKelvey's failure to produce evidence of damages. However, the

Supreme Court's 2010 decision in *Wilkins* made clear that there is no *de minimis* physical injury requirement for excessive force claims; in other words, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." 559 U.S. at 38. Furthermore, even without evidence of damages, McKelvey may still recover, *at minimum*, nominal damages if his excessive force claim prevails at trial. While Section 1997e(e) of the Prison Litigation Reform Act (PLRA) limits the ability of prisoners to recover damages in civil suits, and commands that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act," the PLRA does ***not*** "prevent an inmate from seeking nominal damages for these injuries, even where there is no physical injury."[9] *Jones v. Price*, 696 F. Supp. 2d 618, 624 (N.D.W.Va. 2010); *see also Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) (same); *Briggs v. Marshall*, 93 F.3d 355, 360 (7th Cir. 1996) (recognizing situations where detainee may be entitled to nominal damages on excessive force claim); *Carrington v. Easley*, No. 5:08-CT-3175-FL, 2011 WL 2119421, at *3 (E.D.N.C. Feb. 8, 2011) (recognizing availability of nominal damages despite the PLRA); *McKinney v. Johnson*, No. 2:09-1353-JFA-RSC, 2010 WL 3463110, at *3 (D.S.C. Sept. 2, 2010) (same). Where a person's due process rights are violated, and additional injury (other than being subjected to a violation of a constitutional right) is not shown, nominal damages are an appropriate remedy. *See, e.g.*, *Gray v. Spillman*, 925 F.2d 90, 93-94 (4th Cir. 1991) (recognizing availability of nominal damages in § 1983 action where no proof

---

[9] Pretrial detainees fall within the PLRA's definition of prisoner. 42 U.S.C. § 1997e(h).

of injury other than suffering deprivation of constitutional right and collecting cases); *Taylor v. Jordan*, 922 F.2d 836, 1991 WL 70, at *3 (4th Cir. Jan. 2, 1991) (unpublished table decision) ("This Court has held that although the *de minimis* nature of a constitutional violation may affect the amount of damages, it may not limit the right of action."). As such, if McKelvey were able to prove that Blankenship violated his right to be free from excessive force but failed to establish any damages at trial, a jury could still award McKelvey nominal damages.

For the reasons stated above, the undersigned **RECOMMENDS** that Blankenship's Motion for Summary Judgment, (ECF No. 213), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Blankenship in his personal capacity.

### b. Harshbarger

In his complaint and at his deposition, McKelvey claims that Harshbarger threw him to the floor without provocation, punched him in the head while on the floor, sprayed him with mace while restrained, punched and kicked him while restrained, slammed him to the floor causing a laceration to his lip and broken teeth, rammed his head into walls and doors, and punched him in the face four times while Farrell held him down in medical. Johnson's affidavit confirms that Harshbarger was involved in an altercation with McKelvey and alleges that Harshbarger was in the group of correctional officers that punched McKelvey, rammed his head into walls, and struck him when he was not resisting.

On the other hand, Harshbarger's incident report and discovery responses paint an entirely different picture of the events on September 11, 2011. Harshbarger insists that McKelvey resisted and that McKelvey was only struck in an attempt to restrain him. (ECF

No. 271-7 at 10; ECF No. 271-8 at 40). Harshbarger professes that he only used intentional, reasonable force against McKelvey. (ECF No. 271-8 at 41). Moreover, Harshbarger asserts that McKelvey tripped and fell to the ground during the escort to medical. (ECF No. 271-7 at 10). Harshbarger contends that the incident reports drafted by other officers support his description of what occurred on September 11, 2011. (ECF No. 212 at 6-8).

In essence, Harshbarger argues that his own assertions and the statements of his fellow correctional officers should outweigh the testimony provided by McKelvey and Johnson's affidavit; however, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, ____ U.S. ____, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (quoting *Anderson*, 477 U.S. at 249). Comparing the statements and discovery responses provided by the correctional officers with McKelvey's testimony and Johnson's affidavit leads to the inescapable conclusion that a genuine issue of material fact exists concerning McKelvey's excessive force claim against Harshbarger. At bottom, the reports generated by the correctional officers involved in the September 11 incident and the photographs of McKelvey's injuries establish that an altercation occurred between McKelvey and Harshbarger. (ECF No. 271-3 at 4-7). From there, witnesses and participants report seeing different events occur, with some accounts substantiating an excessive force claim against Harshbarger. When such a circumstance arises, a trier of fact must determine which version of events is to be credited. Accordingly, Harshbarger's implicit request that the Court weigh the evidence in his favor at this stage must be rejected.

Harshbarger also maintains that he is entitled to qualified immunity on

McKelvey's excessive force claim. As to the first prong, if McKelvey's allegations and testimony are taken as true, as they must be at this point, then Harshbarger's actions were far afield from a good faith effort to restore order and more closely resemble actions taken for the sole purpose of causing McKelvey harm. McKelvey insists that he was responsive to Harshbarger's commands, but Harshbarger nonetheless took him to the ground and beat him. According to McKelvey, Harshbarger continued to strike him while he was restrained and sprayed him with mace while restrained. As indicated in some of the Fourth Circuit cases cited above, this force would be excessive if McKelvey were compliant with Harshbarger's orders and submissive to Harshbarger's assertion of control over him. *See, e.g.*, *Sawyer*, 537 F. App'x at 294-95.

With respect to the second qualified immunity prong, as explicated previously, it was clearly established law in 2011 that pretrial detainees were protected from the use of excessive force. *See, e.g.*, *Wernert*, 419 F. App'x at 342. More specifically, the Fourth Circuit has repeatedly held that the striking of a restrained inmate who poses no threat to officer safety violates the right to be free from excessive force. *See Sawyer*, 537 F. App'x at 292-93 (citing *Jones v. Buchanan*, 325 F.3d 520 (4th Cir. 2003), and *United States v. Cobb*, 905 F.2d 784 (4th Cir. 1990)); *Wernert*, 419 F. App'x at 342-43; *Campbell v. Smith*, 406 F. App'x 741, 743 (4th Cir. 2010); *see also Mesmer v. St. Mary's Cty.*, No. 10-1053, 2010 WL 4791884, at *10 (D. Md. Nov. 18, 2010) ("A reasonable officer in early 2009 would obviously have understood that a brutal, unprovoked attack on a handcuffed detainee would violate that detainee's constitutional rights."); *Stewart v. Beaufort Cty.*, 481 F. Supp. 2d 483, 491 (D.S.C. 2007) (concluding, at least as earlier as 2004, "it was clearly established that the unnecessary use of force against an unresisting, handcuffed pretrial detainee resulting in more than de minimis injuries is an excessive use of force in

violation of the Due Process Clause."). The Fourth Circuit's decision in *Wernert* is particularly instructive here. In that case, the plaintiff detainee alleged that he was slammed to the ground by a deputy sheriff while restrained and acting nonthreateningly, which resulted in multiple facial fractures as well as impacted and displaced teeth. 419 F. App'x at 338. Affirming the district court's denial of qualified immunity to the deputy sheriff, the Fourth Circuit wrote that "a reasonable officer ... could not have believed that it would be lawful to slam an already restrained detainee face first into a concrete floor." *Id.* at 342-43. The Court concluded that the "use of force against [the detainee], who was already restrained and posed little possibility of harm to the officers, was not objectively reasonable and contravened clearly established law." *Id.* at 343. In this case, like *Wernert*, McKelvey was fully restrained and nonresistant during at least part of the incident, including when Harshbarger purportedly slammed McKelvey to the floor. Finally, in the Eighth Amendment context, Fourth Circuit "precedent establishes that the use of pepper spray on a docile prisoner could qualify as excessive force." *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. 2014) (citing *Iko v. Shreve*, 535 F.3d 225, 239–40 (4th Cir. 2008), and *Williams v. Benjamin*, 77 F.3d 756, 763 (4th Cir.1996)). Here, McKelvey alleges that he was restrained and docile when Harshbarger sprayed him with mace. Harshbarger plainly had fair warning from established law within the Fourth Circuit that McKelvey possessed a "right to be free from excessive use of pepper spray." *Iko*, 535 F.3d at 240.

In sum, genuine issues of material fact preclude granting summary judgment to Harshbarger on qualified immunity grounds. Consequently, the undersigned **RECOMMENDS** that Harshbarger's Motion for Summary Judgment, (ECF No. 211), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Harshbarger in his personal capacity.

### c. Kelly

During the September 11, 2011 incident, McKelvey alleges that Kelly grabbed his arm while he laid on the ground and threatened to break it. (McKelvey Dep. at 86). Kelly then punched and kicked McKelvey in his cell while he was on the ground and unresisting. (ECF No. 3 at 5). McKelvey also asserts that Kelly was escorting him when he was slammed to the floor. (*Id.* at 6). In contrast, Kelly's incident report indicates that McKelvey was combative and pulled away from officers who tried to restrain and escort him to medical. (ECF No. 211-1 at 4). Kelly's discovery responses also indicate that McKelvey was resistant and "belligerent" during the incident, and that the use of force was necessary to restrain McKelvey. (ECF No. 271-7 at 19; ECF No. 271-8 at 71). Kelly argues that McKelvey has presented no evidence to support the excessive force claim against him and that he is entitled to qualified immunity. (ECF No. 212 at 4-6).

As with the above claims, a genuine issue of material fact exists as to whether Kelly employed excessive force against McKelvey. Kelly acknowledges that he was involved in the restraint and escort of McKelvey on September 11. McKelvey asserts that Kelly struck him while he was being handcuffed and not resisting. Johnson indicates in his affidavit that Kelly was part of the group that punched McKelvey and slammed his head into the glass near Johnson's cell. (ECF No. 226 at 1). In addition, Johnson heard Kelly say that McKelvey "had to get his ass kicked" after the incident was over. (*Id.*) McKelvey and Johnson's statements reveal that Kelly's use of force against McKelvey was disproportionate, and quite simply, unnecessary. If McKelvey were nonresistant, then Kelly would have no reason to repeatedly punch and kick McKelvey other than to inflict pain on him. While Kelly insists that McKelvey was belligerent and combative on September 11, his assertions merely create a genuine issue of material fact; those

assertions do not, however, entitle Kelly to summary judgment.

As for Kelly's assertion that he is entitled to qualified immunity, his argument fails. On the first prong of the qualified immunity analysis, McKelvey has set forth sufficient allegations to establish that his right to be free from the use of excessive force was violated by Kelly. Kelly's behavior, as described by McKelvey, demonstrates a malicious and sadistic desire to harm McKelvey rather than restore discipline. *See Sawyer*, 537 F. App'x at 294-95. This conclusion is bolstered by Kelly's purported statements overheard by Johnson after McKelvey was taken to medical. *Cf. Wernert*, 419 F. App'x at 342 (observing that deputy sheriff's statements after takedown evidenced retaliatory motive). In regard to the second prong, as explained above, the right of a docile and compliant detainee to be free from gratuitous physical violence perpetrated by a correctional officer was clearly established as of September 2011. *See, e.g.*, *Simms*, 104 F. App'x at 857.

Overall, genuine issues of material fact preclude granting summary judgment to Kelly on qualified immunity grounds. Consequently, the undersigned **RECOMMENDS** that Kelly's Motion for Summary Judgment, (ECF No. 211), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Kelly in his personal capacity.

### d. Carter

Although McKelvey did not describe Carter's actions on September 11, 2011 in his complaint, McKelvey testified at his deposition that Carter participated in the escort to medical. (McKelvey Dep. at 106). According to McKelvey, Carter took McKelvey into medical and exited, then took McKelvey to the shower to wash off any mace after he was cleared by medical. (*Id.* at 111-12). In his brief in response to Carter's motion for summary judgment, McKelvey argues that Carter was involved in the escort, which resulted in

McKelvey being seriously injured, and that Carter was "involved in all claims of assault from [the] beginning to the end."[10] (ECF No. 268 at 5). McKelvey also insists that Carter failed to intervene when he was "assaulted" by other officers in medical. (*Id.*)

In Carter's incident report, Carter wrote that he aided other correctional officers in gaining control over McKelvey in his cell and that he placed handcuffs on McKelvey. (ECF No. 211-1 at 10). Carter then assisted in escorting McKelvey to medical and in the decontamination process. (*Id.*) While Carter admits to being present during much of the September 11 incident, he denies observing excessive force being used against McKelvey on that date. (ECF No. 271-8 at 91-95). In his brief in support of his motion for summary judgment, Carter contends that McKelvey has failed to allege or present any evidence that he used excessive force against McKelvey on September 11. (ECF No. 220 at 8). Furthermore, Carter avers that he is entitled to qualified immunity. (*Id.* at 4-5).

McKelvey's complaint and deposition testimony are devoid of any direct participation excessive force allegations against Carter.[11] However, McKelvey's verified complaint does allege that multiple officers "watched or assisted in the assault" on September 11. (ECF No. 3 at 6). Therefore, McKelvey's complaint sufficiently pleads a bystander liability theory of excessive force when he alleges that certain officers merely watched the attack occur. *See Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 419 (4th Cir. 2014) (recognizing that plaintiff need not plead specific elements of bystander liability theory as described in *Randall* and holding that plaintiff's complaint adequately

---

[10] McKelvey cannot create a factual issue for trial by relying on unsworn allegations in his response brief. *See United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004); *Simmons v. Everett*, No. 3:07CV172, 2008 WL 3843455, at *2 (E.D. Va. Aug. 15, 2008).

[11] On January 20, 2015, McKelvey made an oral motion to add Carter as a defendant in this lawsuit. The undersigned granted the motion on the following day. (ECF No. 149).

alleged bystander theory of liability for excessive force claim by stating that officer "allowed" other officers to subject plaintiff to "unreasonable seizure"). Furthermore, McKelvey testified at his deposition that he was attacked for an extended period of time in his cell and that the abuse continued as he was escorted to medical. (McKelvey Dep. at 87-88, 93, 95, 100, 104-06). Carter admits to being present in McKelvey's cell at the time of the altercation and during the escort to medical. (ECF No. 271-8 at 91, 93). Viewing McKelvey's assertions as true, Carter would have been in attendance when McKelvey was gratuitously beaten and sprayed with mace by other officers in his cell and on the way to medical. If Carter observed the scene that McKelvey describes, then clearly Carter would have known that his fellow officers were violating McKelvey's constitutional rights. Moreover, given the length of the incident and the almost constant use of excessive force throughout, there is no reason to believe that Carter would not have possessed a reasonable opportunity to intercede. Even with this opportunity, there is no indication that Carter chose to act on it. Therefore, a genuine issue of material fact exists as to McKelvey's excessive force claim against Carter.[12]

    To the extent that Carter claims he is entitled to qualified immunity on McKelvey's

---

[12] To establish the absence of a genuine issue of material fact on McKelvey's excessive force claim, Carter relies on the lack of detail in McKelvey's testimony concerning Carter's involvement in the altercation. (ECF No. 220 at 8). McKelvey protested numerous times at his deposition that he was temporarily blinded by the mace and so he could not observe each officer's actions. (McKelvey Dep. at 27, 108, 119). McKelvey's temporary blinding argument finds some support in other jurisdictions. *See Williams v. Atkins*, 333 F. Supp. 2d 209, 213-14 (S.D.N.Y. 2004) (denying summary judgment to two defendant police officers where plaintiff arrestee was blinded by pepper spray and could not observe which officer "stomped" on him); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 473 (S.D.N.Y. 2003) ("A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."); *Fowles v. Stearns*, 886 F. Supp. 894, 901 n.8 (D. Me. 1995) ("[I]t would be a cruel irony if a plaintiff could not proceed to trial on his allegations of excessive force because, due to the assault itself, including the use of mace in his face, he could not see, and, therefore, could not identify which officers delivered each blow."). *But see Sheikh v. Morales*, No. 3:05CV495, 2006 WL 2223943, at *1, *5 (D. Conn. July 31, 2006) (granting defendant officers' motion for summary judgment on plaintiff's excessive force claim where plaintiff could not identify which of five officers involved in incident sprayed her with mace).

excessive force claim, his argument fails at this stage. First, taking McKelvey's allegations as true, he has adequately established that Carter violated his right to be free from excessive force by failing to intervene and "functionally participat[ing] in the unconstitutional act[s] of his fellow officer[s]." *Randall*, 302 F.3d at 204 n.24. Second, Carter's duty to intervene and prevent his fellow officers from violating McKelvey's constitutional rights was clearly established in September 2011. *See, e.g.*, *Randall*, 302 F.3d at 204 (decided in 2002). Thus, Carter is not entitled to qualified immunity.

Simply put, genuine issues of material fact preclude granting summary judgment to Carter. Accordingly, the undersigned **RECOMMENDS** that Carter's Motion for Summary Judgment, (ECF No. 219), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Carter in his personal capacity.

### e. Jones

McKelvey alleges in his complaint that Jones entered his cell and placed shackles and handcuffs on him. (ECF No. 3 at 5). At his deposition, McKelvey asserted that Jones placed restraints on him while other officers were punching and kicking him. (McKelvey Dep. at 87-88). McKelvey also testified that Jones was present during the escort to medical. (*Id.* at 96-98). In his response brief, McKelvey avers that Jones "saw other officer[s] assaulting [McKelvey] and was involved himself, and he did not intervene if he was not one of the [officers] that was assaulting [McKelvey]." (ECF No. 268 at 6).

Jones states in his incident report that he entered McKelvey's cell when McKelvey was on the floor with Harshbarger and that he helped to secure McKelvey's legs. (ECF No. 215-1 at 17). Jones then helped Farrell place shackles on McKelvey's legs and exited the cell to return to other duties. (*Id.*) In his discovery responses, Jones indicates that he was present in McKelvey's cell before McKelvey was placed in handcuffs and shackles. (ECF

44

No. 271-8 at 142). In addition, Jones admits that he aided in restraining McKelvey by applying leg shackles, but denies escorting McKelvey into the hallway or "all the way to medical," and states that he was not present when McKelvey fell to the ground in the hall.[13] (*Id.* at 145, 147). Jones denies seeing excessive force being used against McKelvey on September 11. (*Id.* at 144). In his brief in support of summary judgment, Jones contends that McKelvey has never alleged that he took any inappropriate action on September 11. (ECF No. 220 at 7). He argues that "placing an unruly, uncooperative, resisting inmate in restraints in an effort to appropriately subdue him and protect the surrounding officers is definitely not misconduct." (*Id.*) Additionally, Jones claims that he is entitled to qualified immunity. (*Id.* at 4-5).

Viewing the evidence in the light most favorable to McKelvey, a genuine issue of material fact exists as to McKelvey's excessive force claim against Jones. McKelvey asserts that Jones was present in his cell while he was unjustifiably and continuously attacked by other officers. Moreover, McKelvey recalls that Jones was present during at least part of the escort to medical, when McKelvey alleges that he continued to be attacked by officers. At the very least, McKelvey has alleged and provided sufficient evidence of an excessive force claim against Jones on the basis of bystander liability. If Jones were present during the events as described by McKelvey, then he would have known that excessive force was being used and, given the length of time that the attack occurred, Jones would have possessed a reasonable opportunity to intervene and prevent further harm to McKelvey. However, there is no evidence that Jones acted on that opportunity. Thus, a genuine issue of material fact exists as to McKelvey's excessive force claim against Jones.

---

[13] Curiously, however, Jones asserts that he did not witness McKelvey acting aggressively or attempting to strike officers during the escort to medical. (ECF No. 271-8 at 145, 148). One would think that Jones would have stated that he did not possess enough information to determine the truth of the matter.

With regard to Jones's invocation of qualified immunity, his position is unconvincing for the same reason that Carter's qualified immunity assertion fails. First, McKelvey's allegations adequately establish that Jones violated his right to be free from excessive force by failing to intercede and "functionally participat[ing] in the unconstitutional act[s] of his fellow officer[s]." *Randall*, 302 F.3d at 204 n.24. Second, the law was clearly established at the time of the September 11, 2011 incident that Jones possessed a duty to attempt to stop the unconstitutional conduct and prevent McKelvey from suffering further abuse. Therefore, Jones is not entitled to qualified immunity at this stage.

For the aforementioned reasons, genuine issues of material fact preclude granting summary judgment to Jones. Accordingly, the undersigned **RECOMMENDS** that Jones's Motion for Summary Judgment, (ECF No. 219), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Jones in his personal capacity.

### f. Stephens

McKelvey does not mention Stephens in his complaint. At his deposition, McKelvey testified that he did not know whether Stephens was involved in the September 11 incident because he could not see as a result of the mace. (McKelvey Dep. at 131). In his response brief, McKelvey alleges that Stephens failed to intervene and prevent other officers from beating him. (ECF No. 268 at 6). Furthermore, McKelvey asserts that Stephens was one of the officers "involved in ramming [his] head into the walls" and that Stephens "excessively administered mace after [McKelvey] was fully restrained." (*Id.*)

Stephens's incident report reflects that he was present in McKelvey's cell and witnessed McKelvey on the ground struggling with Farrell, Kelly, Harshbarger, and other

46

officers. (ECF No. 215-1 at 19). During the struggle, Stephens delivered several bursts of mace to McKelvey. (*Id.*) After McKelvey was placed in restraints, Stephens returned to other duties. (*Id.*) In his discovery responses, Stephens admits that he was present in McKelvey's cell before McKelvey was restrained and that McKelvey was sprayed with mace two or more times during the September 11 incident. (ECF No. 271-8 at 114-15). However, Stephens denies witnessing any excessive force being used while he was present. (*Id.* at 116). In his brief in support of summary judgment, Stephens emphasizes that McKelvey could not recall any interaction with him at his deposition. (ECF No. 220 at 7). Moreover, Stephens argues that he only assisted other officers who were "struggling to subdue" McKelvey. (*Id.* at 7-8). Additionally, Stephens contends that he is entitled to qualified immunity. (*Id.* at 4-5).

Taking McKelvey's description of events on September 11 as true, a genuine issue of material fact exists as to McKelvey's excessive force claim against Stephens. Stephens admits to being present in McKelvey's cell before McKelvey was restrained and asserts that he departed the cell after McKelvey was restrained. McKelvey alleges that during the time Stephens was present, he was beaten by other officers while he lay submissively and passively on the ground. Certainly then, Stephens would fall into the category of officers that merely "watched" while McKelvey was attacked and failed to act on their duty to intervene. (ECF No. 3 at 6). Moreover, in light of McKelvey's allegations, Stephens's use of mace on McKelvey may have been unnecessary. Consequently, there is a genuine dispute of material fact concerning Stephens's use of force against McKelvey and Stephens's liability as a bystander to excessive force.

As for Stephens's claim that he is entitled to qualified immunity, his argument is unpersuasive at this juncture. McKelvey has adequately established that Stephens may

have violated his right to be free from excessive force by either directly participating in the application of excessive force or standing idly by while McKelvey suffered at the hands of Stephens's fellow officers. Moreover, the law was clearly established at the time of the September 11, 2011 incident that the use of a chemical agent on a docile detainee could violate the detainee's right to be free from excessive force. *Iko*, 535 F.3d at 240. Likewise, at the time of the incident, the law was clearly established that Stephens possessed a duty to attempt to stop his fellow officers' unconstitutional conduct and prevent McKelvey from experiencing further harm. *Randall*, 302 F.3d at 204. Therefore, Stephens is not entitled to qualified immunity at this stage.

For the aforementioned reasons, genuine issues of material fact preclude granting summary judgment to Stephens. Accordingly, the undersigned **RECOMMENDS** that Stephens's Motion for Summary Judgment, (ECF No. 219), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Stephens in his personal capacity.

### g. Farrell

In his complaint, McKelvey states that Farrell was present in medical and instructed him to bend over "the nurse's table." (ECF No. 3 at 6). When McKelvey complied, Farrell watched Harshbarger punch McKelvey four to five times and kick McKelvey. (*Id.*) McKelvey testified that Farrell was "probably" or "maybe" present during the escort to medical and that he recalled hearing Farrell speaking to other officers outside of medical. (McKelvey Dep. at 106). Farrell then entered medical, told McKelvey to bend over the table, and pushed him down onto the table while Harshbarger punched him four times in the face. (*Id.* at 107-08). In his response brief, McKelvey argues that Farrell was present in his cell while he was being punched, kicked, and "rammed into the walls and

48

windows." (ECF No. 268 at 6-7). McKelvey also insists that Farrell was present in medical. (*Id.* at 7).

In his incident report, Farrell indicates that he arrived at McKelvey's cell where he saw officers struggling with McKelvey. (ECF No. 271-3 at 10). Farrell restrained McKelvey's legs, and as Farrell was exiting the area, he heard officers instructing McKelvey to stop pulling away from them. (*Id.*) Farrell then observed McKelvey being lifted to his feet, and McKelvey attempted to kick the escorting officers. (*Id.*) In medical, McKelvey was resistant and continued to kick at the officers for several minutes. (*Id.*) However, Farrell's discovery responses are internally contradictory and conflict with his incident report. In his July 2014 response to McKelvey's requests for admission, Farrell admitted to entering McKelvey's cell and assisting in restraining McKelvey. (ECF No. 271-8 at 27). In a July 2015 response, Farrell stated that he was not present in McKelvey's cell prior to McKelvey being handcuffed and shackled. (*Id.* at 5). In a September 2015 supplemental response, Farrell reports that he was not present in McKelvey's cell at all during the incident. (*Id.* at 18). Farrell also asserts that he did not assist in restraining or placing restraints on McKelvey. (*Id.* at 5-7). Farrell denies witnessing McKelvey being punched in medical, and generally denies observing excessive force used against McKelvey on September 11. (*Id.* at 6, 10). Farrell argues that he is entitled to summary judgment because McKelvey's allegations against him are conclusory and McKelvey has provided no evidence to refute the facts contained in the officers' incident reports. (ECF No. 220 at 6-7). In addition, Farrell claims that he is entitled to qualified immunity. (*Id.* at 4-5).

McKelvey's complaint and deposition testimony establish that there is a genuine issue of material fact as to the excessive force claim against Farrell. Farrell's conduct in

medical, as described by McKelvey, clearly evidences the use of excessive force against McKelvey. The unreasonableness of holding down an injured, compliant detainee so that another officer may strike him is indisputable. Moreover, an issue of fact exists as to whether Farrell was in McKelvey's cell on September 11, and if so, for how long he remained there. If Farrell were there during the beating of McKelvey, then he would have been required to intervene and prevent McKelvey from further harm. Thus, there is a genuine dispute of material fact as to Farrell's use of force against McKelvey and Farrell's liability as a bystander to excessive force.

With respect to Farrell's qualified immunity defense, he is not entitled to summary judgment on that ground. First, as to Farrell's direct participation in excessive force, viewing the evidence in the light most favorable to McKelvey, Farrell's conduct was undoubtedly malicious and sadistic. The conduct described by McKelvey would offend any standard of decency. Furthermore, it was clearly established at the time of the interaction between McKelvey and Farrell in medical that the striking of a restrained detainee who poses no threat to officer safety violates the detainee's right to be free from excessive force. *See, e.g.*, *Sawyer*, 537 F. App'x at 292-93. Second, as to the prospect of bystander liability, a dispute of fact exists concerning the length of Farrell's stay in McKelvey's cell. Considering the evidence in McKelvey's favor, Farrell may have possessed a reasonable opportunity to interfere and stop his fellow officers' unconstitutional conduct. Moreover, Farrell's duty to do so was clearly established at the time of the incident. *Randall*, 302 F.3d at 204.

For the aforementioned reasons, genuine issues of material fact preclude granting summary judgment to Farrell. Accordingly, the undersigned **RECOMMENDS** that Farrell's Motion for Summary Judgment, (ECF No. 219), be **DENIED** insofar as it seeks

summary judgment on McKelvey's excessive force claim against Farrell in his personal capacity.

### h. Gilkerson

McKelvey alleges in his complaint that Gilkerson kicked him and sprayed him with mace "on [his] backside" after he was slammed to the ground during the escort to medical. (ECF No. 3 at 6). At his deposition, McKelvey testified that he saw Gilkerson was present during the escort to medical and heard Gilkerson call him profane names and racial slurs. (McKelvey Dep. at 104-05). McKelvey also testified that Gilkerson kicked him during the escort and recalled that Gilkerson was in possession of a can of mace, but he was uncertain whether Gilkerson sprayed him with mace during the escort. (*Id.* at 105). In his response brief, McKelvey asserts that Gilkerson would have been quick to respond to an officer assistance call in pod A because he was stationed in pod F, which is closest to pod A. (ECF No. 266 at 2). McKelvey insists that he saw Gilkerson in the hallway after he was slammed to the floor and that he observed Gilkerson kick him thereafter. (*Id.* at 5).

In his brief in support of summary judgment, Gilkerson maintains that he was not present for the altercation on September 11. (ECF No. 218 at 2). Gilkerson indicates that the daily shift logs for September 11 show that he was assigned to suicide watch in pod F, where he remained from 11:55 a.m. until 4:19 p.m. (*Id.* at 2-3). Gilkerson points out that he initialed the offender watch logs for two inmates that day every fifteen minutes from 12:15 p.m. until 4:15 p.m. (*Id.* at 3). Moreover, Gilkerson notes that the reports prepared by other officers for the September 11 incident do not mention his involvement. (*Id.*) In his discovery responses, Gilkerson denies that he was present during the escort to medical on September 11. (ECF No. 217-1 at 14-15; ECF No. 271-7 at 56; ECF No. 271-8 at 218). Ultimately, Gilkerson argues that he is entitled to summary judgment because McKelvey

has not presented any "competent evidence" that he was present during the September 11 incident and McKelvey's "self-serving assertions" are insufficient to oppose the documentary evidence supplied by Gilkerson. (ECF No. 218 at 3; ECF No. 274 at 2).

The Fourth Circuit has recognized that "[w]here a witness's deposition testimony 'is blatantly contradicted by the record, so that no reasonable jury could believe it,' an alleged factual dispute created by the testimony need not be credited and 'will not defeat an otherwise properly supported motion for summary judgment.'" *Hodges v. Federal-Mogul Corp.*, 621 F. App'x 735, 741 (4th Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). For instance, where authenticated videotape evidence obviously renders deposition testimony untrue, that testimony may not be used to create a genuine issue of material fact on summary judgment. *See Scott*, 550 U.S. at 378-81. However, where "blatant contradiction" is absent, such that it would possible for the deponent's testimony to be true, a jury should be charged with judging the credibility of the testimony. *See United States v. Cochran*, 39 F. Supp. 3d 719, 739 (E.D.N.C. 2014).

Here, McKelvey's testimony as to Gilkerson's involvement in the September 11 incident may be entirely contradicted by the documentary evidence, but it is not so inherently incredible that a reasonable jury could not believe it. Improbable though it may seem that Gilkerson interacted with McKelvey on September 11 and none of the other officers recorded Gilkerson's presence in their reports, it is possible that the officers simply forgot to mention that Gilkerson was involved in the escort or did not notice his presence. Moreover, there is no evidence to establish that it would be physically impossible for Gilkerson to assist in the escort of McKelvey for a period of time on September 11 and then return to his suicide watch duties. Additionally, while McKelvey's

testimony establishing Gilkerson's presence may be self-serving, it is based on his personal observations that he testified to under oath. Because Gilkerson's presence during the September 11 incident is not beyond the realm of possibility, a jury should decide the credibility of McKelvey's testimony. *See Hodges*, 621 F. App'x at 742 ("[T]he district court erred by assessing [the plaintiff's] credibility and rejecting his evidence at the summary judgment stage. ... Rather, the inconsistencies and possible errors in [the plaintiff's] testimony should be considered and resolved by a jury.").

Turning to the substance of McKelvey's excessive force claim against Gilkerson, a genuine issue of material fact exists. McKelvey asserts that Gilkerson kicked him while fully restrained during the escort to medical. Taking McKelvey's testimony as true, he raises a colorable claim of excessive force since the striking of a restrained inmate who poses no threat to officer safety violates the right to be free from excessive force. *See Sawyer*, 537 F. App'x at 292-93. Therefore, the undersigned **RECOMMENDS** that Gilkerson's Motion for Summary Judgment, (ECF No. 217), be **DENIED** insofar as it seeks summary judgment on McKelvey's excessive force claim against Gilkerson in his personal capacity.[14]

### 2. Supervisory Liability

McKelvey named Aldridge as a defendant in his complaint, but he did not assert any claims against Aldridge. (ECF No. 3 at 5). At his deposition, McKelvey asserted that Aldridge did not "care about the safety and well-being of the inmates." (McKelvey Dep. at 48). McKelvey further testified that Aldridge's responses to his grievances reporting

---

[14] Gilkerson did not raise the issue of qualified immunity in his motion for summary judgment. Nevertheless, Gilkerson is not entitled to summary judgment on that ground given the genuine factual dispute concerning McKelvey's excessive force claim against him. Furthermore, Gilkerson's actions, as alleged by McKelvey, would have violated clearly established law at the time of the September 11, 2011 incident.

beatings or threats by correctional officers were inadequate. (*Id.* at 49). McKelvey stated that he made specific complaints about particular officers, including Harshbarger, Kelly, and Farrell, to Aldridge. (*Id.* at 50). McKelvey remembered reporting to Aldridge that Harshbarger had called McKelvey racial slurs, threatened him, and assaulted him. (*Id.* at 50-51). McKelvey also indicated that he reported threats from Kelly to Aldridge. (*Id.* at 51). As to Farrell, McKelvey recalled telling Aldridge that officers were "assaulting inmates on [Farrell's] shift and telling them not to file grievances ...." (*Id.* at 52). McKelvey believed that Aldridge's responses to these reports and his grievances were callous and that Aldridge should have "formal[ly]" investigated them. (*Id.* at 60-61). Specifically, McKelvey asserted that Aldridge failed to punish an officer who punched him in the head in February 2011. (*Id.* at 61-62). Additionally, McKelvey testified at his deposition that Aldridge "did not file the proper paperwork" or follow the proper procedure for handling complaints and grievances. (*Id.* at 53). In his response brief, McKelvey contends that Aldridge was aware that inmates, including McKelvey, were being beaten by his subordinate officers and Aldridge failed to stop this misconduct. (ECF No. 266 at 2).

    In response, Aldridge avers that McKelvey has failed to provide any evidence establishing Aldridge's knowledge that McKelvey was being subjected to an unreasonable risk of harm by officers at the WRJ. (ECF No. 216 at 6; ECF No. 274 at 3). Aldridge insists that McKelvey's vague assertion that inmates were being attacked by officers are insufficient to escape summary judgment. (ECF No. 274 at 3). Furthermore, to the extent that McKelvey has named Aldridge in his personal capacity, Aldridge contends that he is entitled to qualified immunity as McKelvey has failed to identify any clearly established law that Aldridge or the officers under his supervision violated. (*Id.*

at 5-6).

While claims premised on *respondeat superior* are not permitted under § 1983, *see Monell*, 436 U.S. at 691, supervisory officials may be held liable in their personal capacity for the constitutional violations of those in their charge when "supervisory indifference or tacit authorization of subordinates' misconduct [is] a causative factor in the constitutional injuries [the subordinates] inflict on those committed to their care." *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir. 1994) (citing *Slakan v. Porter,* 737 F.2d 368, 372-73 (4th Cir. 1984)); *see also Clark v. Md. Dep't of Pub. Safety and Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2013). To state a claim against under this doctrine, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw*, 13 F.3d at 799. In regard to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery,* 751 F.3d 214, 226-27 (4th Cir. 2014) (quoting *Shaw,* 13 F.3d at 799). Finally, when addressing the third element, "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... or may be supplied by

the tort principle that holds a person liable for the natural consequences of his actions." *Rauch v. W. Va. Div. of Corrections,* No. 2:13–cv-0468, 2014 WL 3732123, at *4 (S.D.W.Va. July 25, 2014) (quoting *Wilkins,* 751 F.3d at 226-27) (citations omitted).

As to the knowledge prong of the supervisory liability test described in *Shaw*, a genuine issue of material fact exists. McKelvey has provided evidence that, prior to the September 11 incident, he informed Aldridge that he was being threatened by officers under Aldridge's supervision or had experienced the use of excessive force from those officers. First, McKelvey testified that he spoke with Aldridge and informed Aldridge that Harshbarger had threatened and "assaulted" him. (McKelvey Dep. at 50-51). McKelvey also reported to Aldridge that Kelly had threatened him with physical violence and that Farrell was allowing inmates to be attacked during his shift without consequence. (*Id.* at 51-52). Second, McKelvey has submitted multiple grievance forms that he completed prior to September 11, 2011, some of which were reviewed by Aldridge, wherein McKelvey reports that he has been antagonized, threatened, or attacked by officers. (ECF No. 271-2 at 8, 10, 12-14, 16, 20, 23, 39). McKelvey also filed a grievance reporting that he had witnessed an officer "assault" another inmate. (*Id.* at 19). Certainly, these reports would have provided Aldridge some knowledge that his subordinates were engaged in unconstitutional conduct. Third, McKelvey has submitted some documentary evidence drafted by other inmates at the WRJ describing the use of excessive force there before September 11, 2011. (ECF No. 271-1 at 387, 443-44; ECF No. 271-5 at 39-41). Finally, McKelvey has also provided a document showing that Farrell had previously been suspended for using unnecessary force against an inmate in October 2010. (ECF No. 271-9 at 1-3). Taken together, and viewing this evidence in the light most favorable to McKelvey, a genuine issue of fact exists as to whether Aldridge possessed actual or

constructive knowledge that his subordinates were engaging in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to inmates like McKelvey. *Shaw*, 13 F.3d at 799; *see also Smith v. Berlin*, No. 3:12-CV-7358, 2014 WL 4929468, at *14 (S.D.W.Va. Sept. 30, 2014) (finding that genuine issue of material fact existed as to first prong of supervisory liability claim where plaintiff inmate produced disciplinary letters, affidavits of other inmates, and incident reports demonstrating that officers were using excessive force at the WRJ). McKelvey's evidence does not simply establish a single episode of threatening behavior or violence leading up to the September 11 incident; rather, the testimony and documentary evidence supplied by McKelvey may be interpreted to show a pervasive environment of excessive force at the WRJ prior to September 2011, which would be difficult for a supervisor to ignore. Furthermore, the threats and attacks reported by McKelvey demonstrate that he specifically was in the crosshairs of the officers' unnecessary violence. Accordingly, the undersigned finds unconvincing Aldridge's argument that he is entitled to summary judgment because he was unaware that McKelvey was being subjected to an unreasonable risk of harm by his officers.

Turning to the deliberate indifference prong of supervisory liability, while a closer question than the first element, there is at least sufficient evidence for a jury to decide the issue. In response to the grievances submitted by McKelvey describing the officers' threatening or violent behavior, Aldridge twice informed McKelvey that he would send the grievance and any accompanying reports to the Central Office of the Authority for further review. (ECF No. 271-2 at 13, 38-39). Additionally, Aldridge stated to McKelvey that he would "look into" an alleged use of excessive force by multiple officers in August 2011, but later indicated to McKelvey that officers would not have to "put their hands on

[him] if [he] would follow the rules and regulations of [the] facility." (*Id.* at 15, 17). Aldridge similarly responded to McKelvey's complaint of excessive force in February 2011 by stating that McKelvey should "focus on the rules and regulations of [the] facility." (*Id.* at 38). It is unclear whether Aldridge ever addressed the grievance filed by McKelvey concerning the September 10, 2011 altercation with Blankenship. (*Id.* at 10). Furthermore, another officer (with an illegible signature) addressed some of the grievances submitted from McKelvey to Aldridge, but informed McKelvey that officers would not act in the unprofessional manner that he reported. (*Id.* at 20). As for any additional remedial action taken by Aldridge (other than sending McKelvey's grievances higher up the administrative ladder), in February 2011, Aldridge housed McKelvey in booking so that he could monitor McKelvey by video camera to ensure that the staff was treating McKelvey fairly. (*Id.* at 35). At some point, it seems McKelvey was moved from booking, but he was returned there by Aldridge after the September 11 incident. (*Id.* at 6).

While at least one other court within this circuit has found that a supervisor's failure to adequately respond to grievances may not be sufficient to establish deliberate indifference, in this case, a reasonable jury could find that the amount of grievances submitted and complaints made by McKelvey required further action by Aldridge. *Cf. Koon v. Ozmint*, No. 8:06-2000-RBH, 2007 WL 1486067, at *6 (D.S.C. May 18, 2007) ("Mere awareness of a complaint is not sufficient to show knowledge that a subordinate was engaging in conduct that posed a pervasive and unreasonable risk of constitutional injury ....") (markings omitted). *But see Mitchell v. Rappahannock Reg'l Jail Auth.*, 703 F. Supp. 2d 549, 560-61 (E.D. Va. 2010) (finding that inmate sufficiently stated claim for supervisory liability where inmate alleged that she filed request forms to speak with supervisor related to being sexually assaulted, but forms went unanswered and supervisor

never met with her). Where grievances are one of the few avenues available for an inmate to vindicate his constitutional rights, the administration's failure to appropriately address and investigate those grievances should not be brushed aside.[15] Here, any number of solutions, other than just simply passing the grievance to the Authority's Central Office or instructing McKelvey to follow the rules, could have been available to Aldridge. For instance, there is no evidence that Aldridge attempted to counsel those officers accused of threatening or employing excessive force against McKelvey. There is also no evidence that Aldridge considered the possibility of prohibiting certain officers from interacting with McKelvey. Similarly unappreciable from the record is whether Aldridge addressed the feasibility of requiring certain officers accused of threats or violence against McKelvey to record their interactions with him. All of these possibilities should have been reasonably apparent to Aldridge in addressing McKelvey's allegations of threats and excessive force, even considering that Aldridge is undoubtedly responsible for the safety of a large number of inmates with a minimal amount of resources. Put simply, when Aldridge responded to McKelvey's grievances describing threats and physical violence by passing them up the chain of command or informing McKelvey to follow the rules, he essentially shrugged at the significant potential for McKelvey's situation to escalate into that which occurred on September 11. Aldridge's indifferent response is sufficient to establish a genuine issue of material fact as to the second element of supervisory liability.

Likewise, a genuine issue of material fact exists as to causation. Under a supervisory liability theory, Aldridge is liable for the "natural consequences of his actions." *Rauch*, 2014 WL 3732123, at *4. McKelvey certainly has a reasonable argument

---

[15] In support of this proposition, one need only review McKelvey's submissions in this case. McKelvey has insisted that he has attempted to file complaints with local and state police departments to no avail because those departments defer to the administrative process in the WRJ.

that had Aldridge took additional action to investigate or remedy the threats and violence McKelvey reported, then the September 11 incident would not have happened. For example, some of the officers may not have been involved in the incident or may have received further training on the proper use of force. Moreover, some of the officers may have circumscribed their conduct if they knew that their interactions with McKelvey had to be videotaped. In essence, McKelvey may establish that the excessive force he experienced on September 11 was a result of Aldridge's failure to take his complaints of threats and violence seriously, which led to excessive force being generally permitted and specifically targeted at McKelvey on September 11.

Finally, the undersigned rejects Aldridge's contention that he is entitled to qualified immunity at this stage. "The Fourth Circuit explained that [a] plaintiff must establish three elements in order to demonstrate that a supervisor lacks qualified immunity: (1) at the time of the subordinate's conduct, it was 'clearly established' that a supervisor could be held liable under § 1983 for his subordinate's constitutional violations; (2) at the time of the supervision it was 'clearly established' that the degree of force used by the subordinate was unconstitutional; and, (3) a reasonable person in the supervisor's position would have known that his actions were unlawful." *Pryor v. Debnam*, No. 5:98-CV-613-BR, 1999 WL 1939989, at *6 (E.D.N.C. Mar. 22, 1999) (citing *Shaw*, 13 F.3d at 801). As to the first issue, *Shaw* held that § 1983 liability for supervisors had been clearly established within the Fourth Circuit since 1984. 13 F.3d at 802. With regard to the second issue, it was clearly established at the time that McKelvey reported incidents of excessive force leading up to September 11, 2011 that officers could not gratuitously beat an inmate who posed no threat to officer safety. *See Sawyer*, 537 F. App'x at 292-93. Concerning the third question, *Shaw* establishes that no reasonable

officer could believe that it would be lawful to "ignor[e]" complaints of excessive force perpetrated by a subordinate. 13 F.3d at 802. Here, according to the facts alleged by McKelvey, Aldridge essentially ignored McKelvey's complaints by passing them up the administrative ladder, informing McKelvey to follow the WRJ's rules, and failing to take any remedial measures with respect to the officers that Aldridge supervised on a daily basis. Therefore, Aldridge is not entitled to qualified immunity at this juncture.

For the aforementioned reasons, genuine issues of material fact preclude granting summary judgment to Aldridge. Accordingly, the undersigned **RECOMMENDS** that Aldridge's Motion for Summary Judgment, (ECF No. 215), be **DENIED** insofar as it seeks summary judgment on McKelvey's supervisory liability claim against Aldridge in his personal capacity.

### D. McKelvey's Claims Against Administrator Clark and Coffey

#### 1. Administrator Clark

As discussed above, McKelvey named Administrator Clark as a defendant in his complaint. (ECF No. 3 at 5). However, Administrator Clark has not been served with the summons and complaint in this case. On December 5, 2013, the summons addressed to Administrator Clark and sent via certified mail by the United States Marshals Service was returned unexecuted. (ECF No. 33). On December 30, 2014, McKelvey moved for a default judgment against Administrator Clark. (ECF No. 143). The undersigned denied McKelvey's motion because Administrator Clark was never served with the summons and complaint. (ECF No. 151). On February 9, 2015, McKelvey filed an Affidavit of Non-Residency or Unknown Residency for Service by Publication wherein he asserted that he had used due diligence to ascertain the whereabouts of Administrator Clark, but was unable to do so. (ECF No. 168). McKelvey took no further action with respect to the service

of Clark after filing the affidavit, and to date, Clark has not been served with the summons and complaint in this action.

Federal Rule of Civil Procedure 4(e) sets forth the appropriate methods for serving an individual within a judicial district of the United States. The rule provides four ways to sufficiently accomplish service: (1) "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made"; (2) "delivering a copy of the summons and of the complaint to the individual personally"; (3) "leaving a copy of each [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there"; or (4) "delivering a copy of each to an agent authorized by appointment or by law to receive service of process." Fed. R. Civ. P. 4(e). According to Federal Rule 4(c), when a plaintiff is authorized to proceed *in forma pauperis* under 28 U.S.C. 1915 (as in the instant action), the court must order the United States Marshal or Deputy Marshal to serve the summons and complaint. If service is not made on a defendant in one of the four ways described above within 120 days of the complaint being filed, "the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specific time." Fed. R. Civ. P. 4(m).[16] "Absent a showing of good cause, the tardy plaintiff's action may be dismissed without prejudice after 120 days. ... [T]he dismissal may occur either as a result of a motion to dismiss by the defendant or be ordered on the initiative of the court after notice to the plaintiff." 4B Charles Allen Wright & Arthur R. Miller,

---

[16] Rule 4(m) goes on to state that "if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." The time limit for service was amended to ninety days on December 1, 2015.

Federal Practice and Procedure § 1137 (4th ed. 2015).

McKelvey's affidavit evidences an attempt pursuant to Federal Rule of Civil Procedure 4(e)(1) to serve Administrator Clark under the service by publication provision contained in West Virginia Rule of Civil Procedure 4(e)(1). The West Virginia rule states: "If the plaintiff files with the court an affidavit … [t]hat the plaintiff has used due diligence to ascertain the residence or whereabouts of the defendant, without effect … then the clerk shall enter an order of publication against such named and unknown defendants."[17] W. Va. R. Civ. P. 4(e)(1). West Virginia case law makes clear that conclusory assertions of due diligence do not satisfy the rule. *See State v. Young*, 117 S.E. 688, 691 (W. Va. 1923). Instead, the affidavit should state what steps the plaintiff took to accomplish personal service, so that the court may make a determination as to the plaintiff's diligence based on the facts presented. *See id.*; *cf. United States Foodservice, Inc. v. Donahue*, 764 F. Supp. 2d 816, 822 (S.D.W.Va. 2011) (finding that plaintiff complied with West Virginia Rule 4(e)(1) where plaintiff set forth in affidavit "fifteen numbered paragraphs [related to] the plaintiff's attempt to locate and serve" defendant); *Wallace v. Cmty. Radiology*, No. 1:09-0511, 2011 WL 4596694, at *4 (S.D.W.Va. Sept. 30, 2011) (recognizing that plaintiff must "demonstrate due diligence" under West Virginia Rule 4(e)(1)). However, McKelvey's affidavit contains precisely the type of conclusory assertion that is insufficient

---

[17] West Virginia Rule of Civil Procedure 4(e)(1) further provides:

> Every order of publication shall state the title of the action; the object thereof; … that a copy of the complaint may be obtained from the clerk; and that each named and unknown defendant must appear and defend on or before a date set forth in the order, which shall be not fewer than 30 days after the first publication thereof; otherwise, that judgment by default will be rendered against the defendants at any time thereafter. Every such order of publication shall be published once a week for two successive weeks (or for such period as may be prescribed by statute, whichever period is longer) in a newspaper of general circulation in the county wherein such action is pending. Proof of service by publication is made by filing the publisher's certificate of publication with the court.

for service by publication under West Virginia Rule of Civil Procedure 4(e)(1). McKelvey has failed to provide the Court with any facts concerning his attempt to locate and serve Administrator Clark. Moreover, after filing his affidavit, McKelvey did not move for an order of publication from this Court or take any further action with respect to serving Administrator Clark, such as researching a place where Administrator Clark could be served and providing that information to the Clerk of Court or the United States Marshal Service. The undersigned is cognizant that McKelvey is incarcerated and proceeding *pro se*; nevertheless, that does not excuse McKelvey from following the procedural requirements for service by publication. *See Rose v. United States Postal Serv.*, 352 F. App'x 82, 84 (7th Cir. 2009) (recognizing that party's *pro se* status does not excuse him from complying with requirements of Federal Rule of Civil Procedure 4); *Sys. Signs Supplies v. United States Dep't of Justice*, 903 F.2d 1011, 1013 (5th Cir. 1990) (observing that *pro se* status does not excuse litigant from effecting service).

Because McKelvey has failed to serve Administrator Clark within 120 days of filing his complaint, and his affidavit of unknown residency is insufficient to warrant service by publication under the West Virginia Rules of Civil Procedure, the undersigned **RECOMMENDS** that McKelvey's claim against Administrator Clark be **DISMISSED, without prejudice**, pursuant to Federal Rule of Civil Procedure 4(m). The undersigned further **RECOMMENDS** that this PF & R serve as the notice of dismissal for McKelvey's claim against Administrator Clark as required by Rule 4(m).

### 2. Coffey

In June 2014, McKelvey was permitted to amend his complaint and add Coffey as a defendant in this action. (ECF No. 60 at 1-2; ECF No. 79 at 1). The undersigned ordered Defendants' counsel to provide the last known address for Coffey, so that Coffey could be

served with the summons and complaint in this case. (ECF No. 79 at 1-2). Defendants' counsel subsequently notified the Clerk of Court that he could not obtain Coffey's address or contact information. (ECF No. 85). As such, a summons was never issued for Coffey, and Coffey has not been served in this action. On February 9, 2015, McKelvey filed an Affidavit of Non-Residency or Unknown Residency for Service by Publication wherein he asserted that he had used due diligence to ascertain the whereabouts of Coffey, but was unable to do so. (ECF No. 169). However, McKelvey's affidavit with respect to Coffey suffers from the same defect discussed above—the affidavit is entirely conclusory and lacks any factual substance. Although Defendants' counsel has purportedly filed a motion for summary judgment on Coffey's behalf, (ECF No. 219), that appears to be an error on counsel's part since nothing in the record evidences that Coffey has been served in this case or that counsel had Coffey's permission to accept service on his behalf and represent him in this action. Likewise, the docket seems to reflect a mistake by counsel in that he submitted a filing titled on the docket sheet as a "Certificate of Service filed by C.O. Coffee for Responses to Plaintiff's Request for Admission," when there is no evidence that Coffey completed any discovery responses in this case. Notwithstanding these mistakes, the undersigned concludes that McKelvey has failed to serve Coffey within 120 days of amending his complaint to name Coffey as a defendant, and McKelvey's affidavit of unknown residency is insufficient to warrant service by publication under the West Virginia Rules of Civil Procedure. Therefore, the undersigned **RECOMMENDS** that McKelvey's claim against Coffey be **DISMISSED, without prejudice**, pursuant to Federal Rule of Civil Procedure 4(m). The undersigned further **RECOMMENDS** that this PF & R serve as the notice of dismissal for McKelvey's claim against Coffey as required by Rule 4(m).

### V.    Proposal and Recommendation

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the United States District Judge accept and adopt the findings herein and **RECOMMENDS** the following:

1. The Motion for Summary Judgment filed by the WRJ, (ECF No. 221), be **GRANTED**, and Plaintiff's claim against the WRJ be **DISMISSED**;

2. The Motions for Summary Judgment filed by Defendants Harshbarger, Kelly, Blankenship, Gilkerson, Carter, Farrell, Jones, and Stephens, (ECF Nos. 211, 213, 217, 219), be **GRANTED,** in part, and **DENIED**, in part. All of Plaintiff's claims against these defendants in their official capacities should be **DISMISSED**. Plaintiff's excessive force claims against these defendants in their personal capacities should proceed to trial;

3. The Motion for Summary Judgment filed by Aldridge, (ECF No. 215), be **GRANTED**, in part, and **DENIED**, in part. All of Plaintiff's claims against Aldridge in his official capacity should be **DISMISSED**. Plaintiff's supervisory liability claim against Aldridge in his personal capacity should proceed to trial;

4. Plaintiff's claims against Administrator Clark and Coffey be **DISMISSED, without prejudice**;

5. The presiding District Judge reconsider Plaintiff's motions for the appointment of counsel, (ECF Nos. 2, 200), which were denied without prejudice, to determine whether Plaintiff requires the assistance of counsel at the trial of this civil action; and

6. That a pretrial hearing and a trial date be scheduled.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure. The parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with

the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Plaintiff, Defendants, counsel of record, and any unrepresented party.

**FILED:** January 6, 2016

Cheryl A. Eifert
United States Magistrate Judge