## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

JAMES McKELVEY,

                    Plaintiff,

v.                                          CIVIL ACTION NO.   3:13-22206

WESTERN REGIONAL JAIL, et al.,

                    Defendants.

### MEMORANDUM OPINION AND ORDER

Plaintiff Jemel McKelvey ("McKelvey") brings this action pro se under 42 U.SC. § 1983 for violation of his civil rights while a pretrial detainee at the Western Regional Jail (the "Jail") in Barboursville, West Virginia. Compl, ECF No. 1. The action was referred to the Honorable Cheryl A. Eifert, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), for submission to this Court of proposed findings of fact and recommendation for disposition ("PF&R"). The Magistrate Judge has submitted a thoroughly prepared PF&R on Motions for Summary Judgment brought by Defendants Harshbarger and Kelly, ECF No. 211, Defendant Blankenship, ECF No. 213, Defendant Aldridge, ECF No. 215, Gilkerson, ECF No. 217, Defendants Carter, Coffey, Farrell, Jones, and Stephens, ECF No. 219, and Western Regional Jail ("WRJ"), ECF No. 221, (collectively "Defendants"). Defendants presented timely objections to portions of the Magistrate Judge's PF&R. Def.'s Objections to PF&R, ECF No. 277 [hereinafter Obj.]. For the following reasons, the Court **OVERRULES** Defendants' objections, **ACCEPTS** and **INCORPORATES** herein the findings and recommendations of the Magistrate Judge, and **GRANTS** in part and **DENIES** in part Defendants' motions.

## II. Background

Defendants do no contest the factual findings made by the Magistrate Judge, only the Magistrate Judge's legal conclusions. Finding support in the record for the Magistrate Judge's factual conclusions, the Court adopts the factual findings relevant to Defendants' motion for summary judgment as presented in the PF&R. PF&R 3–18, ECF No. 275.

## III. Standard of Review and Legal Standard

This Court conducts a *de novo* review of those portions of the magistrate judge's proposed findings and recommendations to which a party objects. 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."). The Court, however, is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendations to which no objections are made. *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

The nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." *Anderson*, 477 U.S. at 256. Summary

judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23-2- (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## IV. Discussion

As to be expected, Defendants object to the PF&R insofar as the Magistrate Judge recommends partially denying their motions for summary judgment. Specifically, Defendants argue the Court should find they are sued only in their official capacities, not personally, and grant summary judgment for Defendants on McKelvey's claims against Defendants in their personal capacities. Obj. at 2, 7. Next, Aldridge contends McKelvey has lodged no claim against him specifically, and any supervisory liability claim brought against him under Section 1983 fails as a matter of law. Lastly, Gilkerson asserts he is entitled to summary judgment on the Section 1983 claim against him because McKelvey has offered insufficient evidence that he was even present during the events giving rise to this action. Below, the Court considers Defendants' arguments in turn.

### A.  *Defendants Are Being Sued in Both their Personal and Official Capacities*

In their objections to the PF&R, Defendants argue the Magistrate Judge erred by determining the Defendants are being sued in both their official and personal capacities. Obj. at 2, 7. In his letter-form Complaint and Amended Complaint, McKelvey neglected to specify in what capacity he is suing Defendants. The defendants' personal or official character determines a number of matters in an action, including the relief obtainable and defenses available. As such, the capacity of defendants is no trivial matter, and defendants are entitled to notice of the capacity in

which they must defend themselves. *See Marks v. U.S. Soc. Sec. Admin.*, 92 F.3d 1180 (4th Cir. 1996) (determination of defendant's capacity "weighs heavily" on issues of case, including defenses like sovereign or qualified immunity and merits questions).

When a plaintiff does not allege capacity specifically, the court "must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity. *Biggs v. Meadows*, 66 F.3d 56, 57 (4th Cir.1995). In assessing the nature of a plaintiff's claim, failure to allege the defendant acted in accordance with a governmental policy or custom indicates the defendant is sued personally, not in an official capacity. *Id.* at 61. In considering the nature of the relief sought, the plaintiff's request for compensatory or punitive damages indicates a personal capacity suit because such relief is unavailable in official capacity suits. *Id.* And looking to the course of proceedings, if a defendant raises the qualified immunity defense, this indicates a personal capacity suit because qualified immunity shields an individual from suit in his or her personal capacity only; therefore, the defendant raising a qualified immunity defense is on notice of a claim against him or her personally. *Id.*; *Foreman v. Griffith*, 81 F. App'x 432, 435 (4th Cir. 2003); *Sarkissian v. W. Va. Univ. Bd. of Governors*, No. 05-144, 2007 WL 1308978, at *5 (N.D.W. Va. May 3, 2007).

Reviewing McKelvey's Amended Complaint and other filings, the Magistrate Judge applied the standard from *Biggs* and determined that McKelvey is suing Defendants in both their personal and official capacities. PF&R at 25. Upon de novo review, the Court finds no error in the Magistrate Judge's application of *Biggs's* factors to this case. Additionally, although McKelvey did not state in either of his Complaints the capacity in which he is suing Defendants, he did clarify in his response to motions for summary judgment that he was suing Defendants in both their personal and official capacities. ECF No. 266 at 3; ECF No. 267 at 3; ECF No 268 at 3. Courts

-4-

have looked to later pleadings, such as responses to motions for summary judgment, to determine whether proper notice had been given to Defendants regarding the capacities in which they were being sued. *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (citing *Abdur–Rahman v. Michigan Dept. of Corrections*, 65 F.3d 489, 491 (6th Cir. 1995)). The date for trial is yet to be set in this case; hence, McKelvey's response to their motions for summary judgment provides Defendants ample notice of their personal capacity in this suit. Moreover, Defendants have previously asserted the qualified immunity defense as an alternative theory "so as not to waive all possible defenses." Obj. at 3. The Defendants' decision to assert the qualified immunity defense shows they perceived McKelvey possibly stated a claim against them in their individual capacities, indicating they had notice they were being sued personally. *See Castle v. Wolford*, 165 F.3d 17 (4th Cir. 1998) (reasoning that defendants' argument indicated they perceived complaint stated claim against them personally); *Sarkissian*, WL 1308978, at *5 ("The assertion of a qualified immunity defense suggests that the defendants perceived the amended complaint to bring a claim against [defendant] in her [personal] capacity since qualified immunity is unavailable in official capacity suits."). Because McKelvey clarified in his response to motions for summary judgment the capacity in which he is suing Defendants, and for the reasons offered by the Magistrate Judge in applying the *Biggs* factors, *see* PF&R at 26–27, the Court finds McKelvey is suing Defendants in their personal and official capacities and Defendants had adequate notice of such.[1] Defendants' motion for summary judgment on claims brought against them personally is denied.

---

[1] Although McKelvey brought this case against Defendants both in their official and personal capacities, the Court recognizes that in this Order it will dismiss McKelvey's claims against Defendants in their official capacities, leaving only the claims against Defendants personally.

### B.  Motion for Summary Judgment by Aldridge

For three reasons Aldridge argues the Section 1983 supervisory liability claim lodged against him fails as a matter of law.[2] First, Aldridge insists that McKelvey's Amended Complaint, which was prepared pro se, has made no claims against Aldridge specifically and the Magistrate Judge constructed McKelvey's legal arguments into a claim for supervisory liability. Obj. at 1. Second, looking to McKelvey's supervisory liability claim, Aldridge argues this fails the summary judgment test because McKelvey has not produced evidence Aldridge was deliberately indifferent under the circumstances of this case. *Id.* at 4. Lastly, Aldridge asks for summary judgment in his favor because he asserts qualified immunity from suit in his personal capacity. *Id.* The Court deals with Aldridge's arguments in turn.

### 1.  McKelvey's Complaints State a Section 1983 Claim Against Aldridge

Turning to Aldridge's first argument for summary judgment, the allegations in McKelvey's letter-form Complaint and Amended Complaint, both prepared pro se, establish his Section 1983 supervisory liability claim against Aldridge.[3] "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). In liberally construing pro se pleadings, the Fourth Circuit has held that failing to allege an element of the claim is not a proper ground for dismissing a claim so long as the Defendant had notice of a plausible claim for relief. *Weatherholt v. Bradley*, 316 F.

---

[2] In addition to these three reasons, Aldridge contends the supervisory liability claim fails because McKelvey failed to specify that Aldridge was being sued in his personal capacity; however, in Part IV.A above the Court has rejected this argument with regard to all Defendants in this action.

[3] As an initial matter, Aldridge's first argument—that McKelvey's claim against him fails because the Complaint does not by its terms assert a claim specifically against Aldridge, nor does it set forth actions or inactions on the part of Aldridge—is more properly an argument for dismissal under 12(b)(6). Because a 12(b)(6) motion to dismiss may be made any time up to and including trial, Fed. R. Civ. P. 12(h)(2), the Court will consider Aldridge's first argument for summary judgment as an argument for dismissal under 12(b)(6), or alternatively, for summary judgment.

App'x 300, 302 (4th Cir. 2009). Additionally, the Fourth Circuit has looked to documents outside the face of the complaint to determine whether the Defendant had notice of a plausible claim against him or her. *See id.* (finding document attached to complaint indicated defendant had notice of plausible claim against her). "Where the motion to dismiss involves 'a civil rights complaint, [courts] must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *Hall v. Burney*, 454 F. App'x 149, 150 (4th Cir. 2011) (quoting and citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). Hence, in considering dismissal of a pro se plaintiff's Section 1983 claim, even if the complaint fails to specify what legal theory has been violated, a claim under that theory should not be dismissed so long as the factual allegations put the defendant on notice of a plausible claim against him or her.

Reviewing the allegations in McKelvey's two pro se Complaints, the Court cannot conclude with certainty that McKelvey is not entitled to relief under any legal theory. The Magistrate Judge properly noted that McKelvey named Aldridge as a defendant to this action but failed to specify the claim brought against Aldridge. PF&R at 53; ECF No. 3 at 5. McKelvey did, however, allege facts over the course of two complaints that suggest a supervisory liability claim against Aldridge.

McKelvey's letter-form Complaint and Amended Complaint allege facts which suggest McKelvey might plausibly be entitled to relief under a Section 1983 supervisory liability theory. Initially, McKelvey filed a letter-form complaint, and later, a complaint based on a form provided by the Clerk of the Southern District of West Virginia. ECF Nos. 1, 3. When, as here, a pro se plaintiff files a letter-form complaint and soon after files an amended complaint based on a form

provided by the clerk's office, a court considering a motion to dismiss should consider the factual allegations contained in both documents. *See Bright v. Stevens Corr. Ctr.*, No. 09-1121, 2012 WL 5285393, at *1 (S.D.W. Va. Sept. 17, 2012) *R. & R. adopted,* No. 09-1121, 2012 WL 5285770 (S.D.W. Va. Oct. 24, 2012); *Stewart v. W. Va.*, No. 11-0587, 2011 WL 10007429, at *1 (S.D.W. Va. Sept. 15, 2011) *R. & R. adopted*, No. 11-0587, 2013 WL 453083 (S.D.W. Va. Feb. 6, 2013). In his letter-form Complaint, McKelvey alleges that on September 11, 2011 he was maliciously assaulted, degraded, forced to endure racial assaults, and traumatically disoriented. ECF No. 1 at 1. He further alleges he told the Jail he wanted to press charges but the Jail's administration wrote his claims off. *Id.* McKelvey's letter-form complaint also alleges that on August 18, 2013 a correctional officer involved in the incident told him, "[t]hat's why I knocked your teeth out," after which McKelvey wrote the Jail administration; the administration responded that "if a correctional officer would have done anything against policy, action would have been taken then. It was a lawful takedown because of [McKelvey's] actions at the time." ECF No. 1 at 2.

The Amended Complaint alleges over several paragraphs that McKelvey was assaulted or subjected to excessive force on three separate occasions, and that as a result, McKelvey filed grievances with the Jail administration. ECF No. 3 at 3, 5, 7. Additionally, in explaining his difficulties communicating with the Clerk's office, McKelvey reported that he had filed a grievance about his inmate phone account being tampered with and Aldridge had denied any tampering. ECF No. 3 at 11. Aldridge was a member of the Jail administration to which McKelvey reported the September 11, 2011 incident and later grieved. Thus, over the course of his two complaints, McKelvey alleges that he reported and grieved to Jail supervisors, including Aldridge, about several instances of excessive force, but Aldridge and other supervisors only wrote off McKelvey's claims and attempted to justify the correctional officers' actions.

Considering the allegations in McKelvey's two complaints and the standard for supervisory liability under Section 1983, Aldridge was on fair notice that McKelvey presented a Section 1983 supervisory liability claim against him and other Jail supervisors. Supervisory officials may be held personally liable under Section 1983 for the constitutional violations of their subordinates when "supervisory indifference or tacit authorization of subordinates' misconduct [is] a causative factor in the constitutional injuries [the subordinates] inflict on those committed to their care." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (citing *Slakan v. Porter*, 737 F.2d 368, 372-73 (4th Cir. 1984)); *see also Danser v. Stansberry*, 772 F.3d 340, 350 (4th Cir. 2014) ("A supervisor may be held liable under a tacit authorization theory if that supervisor fails to take action in response to a known pattern of comparable conduct occurring before the incident at issue took place.") (citation omitted). To state a supervisory liability claim under the tacit authorization doctrine, a plaintiff-prisoner must allege: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Shaw*, 13 F.3d 799; *see also Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002); *Moore v. Greenwood Sch. Dist. No. 52*, 195 F. App'x 140, 144 (4th Cir. 2006). As detailed above, over the course of his two complaints, McKelvey alleged facts to support a Section 1983 supervisory liability claim against Aldridge. Under the first prong, McKelvey alleges he told Jail administration, including Aldridge, on several occasions that Aldridge's correctional officer subordinates had assaulted, threatened, harassed, and beaten McKelvey and others on three different occasions. As for the

second prong, McKelvey alleged that Aldridge responded to these reports by writing McKelvey off and justifying the behavior but never investigating, per the Authority's "formal procedure," the factual underpinnings of McKelvey's reports and grievances. Under the third prong, McKelvey did not specifically allege Aldridge's inaction was a cause of his later injuries, however, failure to specifically allege this element is excusable because the other facts alleged provided Aldridge with notice of McKelvey's Section 1983 supervisor liability claim against him. *Weatherholt*, 316 F. App'x at 302. Based on the allegations in McKelvey's two complaints, the Court finds McKelvey presented a Section 1983 supervisory liability claim against Aldridge. Accordingly, the Court adopts the Magistrate Judge's recommendation and finds dismissal of McKelvey's Section 1983 supervisory liability claim due to inadequate pleading is inappropriate.

### 2. McKelvey's Section 1983 Claim Against Aldridge Survives Summary Judgment

Addressing Aldridge's second argument, summary judgment on the merits of the supervisory liability claim is inappropriate at this stage. Aldridge agrees with the Magistrate Judge's recitation of standards for a Section 1983 supervisory liability claim; however, he contends the Magistrate Judge erred in applying the deliberate indifference prong of a Section 1983 supervisory liability claim and maintains McKelvey has failed to produce evidence to support this prong. Obj. at 4. The Court disagrees with Aldridge.

The Magistrate Judge correctly applied the deliberate indifference prong of a Section 1983 supervisory liability claim and in recommending that a reasonable juror could find Aldridge was deliberately indifferent under the circumstances. As noted by the Magistrate Judge, deliberate indifference may be established "by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Wilkins v. Montgomery*, 751 F.3d 214, 226-27 (4th Cir. 2014) (quoting Shaw, 13 F.3d at 799). At his deposition and in filings with this Court, McKelvey

developed the factual allegations surrounding Aldridge's deliberate indifference. PF&R 53–54. McKelvey testified during his deposition that Aldridge did not "care about the safety and well-being of the inmates." Deposition of Jamel McKelvey 49, ECF No. 282. McKelvey further testified that Aldridge responded to grievances reporting correctional officers' beating and threating McKelvey by saying, "[i]f you only follow the rules, then nobody would have to put their hands on you." *Id.* at 49. Later in his deposition, McKelvey stated that he complained about particular officers to Aldridge. *Id.* at 50. McKelvey remembered reporting to Aldridge that Harshbarger was not doing his job and that he had called McKelvey racial slurs, threatened him, and assaulted him. *Id.* at 50–51. McKelvey also reported to Aldridge that Officer Kelly threatened him. *Id.* at 51. As for Officer Farrell, McKelvey recalled telling Aldridge that officers were "assaulting inmates on [Farrell's] shift and [Farrell was] telling [inmates] not to file grievances . . . ," but Aldridge took no action on this. *Id.* at 52. At one point in his deposition, McKelvey was asked about Aldridge's specific "wrongdoing," to which McKelvey responded: Aldridge was not "doing his job"; Aldridge, despite McKelvey's in-person reports and grievances, never followed the proper process to ensure McKelvey's safety, even after multiple allegations of assault and threats, and by this McKelvey clarified he meant that Aldridge never conducted a "formal investigation" of these complaints and grievances. *Id.* at 60–61. To support this, McKelvey claimed Aldridge failed to punish an officer who punched McKelvey in the head in February 2011. *Id.* at 61–62. Additionally, McKelvey testified that Aldridge "did not file the proper paperwork" or follow the "proper procedure" with the Authority for handling grievances. *Id.* at 53. In his brief responding to Aldridge's motion for summary judgment, McKelvey maintains Aldridge was aware that inmates, including McKelvey, were being assaulted, threatened, harassed, or otherwise mistreated by Aldridge's subordinate officers, and Aldridge failed to stop this misconduct. ECF No. 266 at 2;

-11-

*see also id.* at 4 (stating Aldridge was "well aware of the misconduct and serious injury being inflicted upon the inmates," yet he did nothing to stop it and even "assisted in covering it up or trying to rationalize such conduct").

Additionally, McKelvey has filed with the Court numerous grievances he brought to Aldridge and other Jail administrators beginning in early 2011; a summary of the relevant grievances will follow.

On February 10, 2011, McKelvey sent Aldridge a grievance complaining about an incident where Officer Ryder used force against McKelvey. ECF No. 271–2 at 39. According to the February 10 grievance, Officer Ryder, in response to McKelvey's stepping out of his cell and asking a provocative question, gripped his hands around McKelvey's neck, pushed McKelvey to the wall of his cell and forced him to sit down on a bench. To get Ryder's hands off his neck, McKelvey grabbed Ryder's wrists, and Ryder then called for assistance. *Id.* After another officer arrived, both instructed McKelvey to get onto the ground. As McKevey got stomach-first onto the ground, Ryder got onto McKelvey's back and started kneeing and punching him in the head eight times, causing McKelvey's head to sail against the floor. Toward the end of his February 10 grievance, McKelvey said he considered the incident assault and corporal punishment and he wanted to talk to Aldridge in person about pressing charges. To the February 10 grievance, Aldridge responded in full, "[y]our grievance along with reports will be sent to Charleston[, WV] for further review." *Id.*

On February 14, 2011, McKelvey formally grieved to Aldridge about feeling stereotyped and unheard during an interview set up by Jail administration between McKelvey and a law enforcement officer regarding the February 10 use-of-force incident. ECF No. 271–2 at 37. at To the February 14, 2011 grievance, Aldridge responded, "[t]hanks for your insight on the

conversation with myself and Mr. Clark[.] I explained to you yesterday that your allegations would be investigated by this agency and if needed[,] they will forward to local law enforcement for appropriate actions. As I explained to you Monday [February 14, 2011,] you need to focus on following the rules and regulations of [the] facility[] and I will focus on the security aspects of [the Jail]." *Id.* at 38.

February 16, 2011, McKelvey filed an inmate request to Jail counselors asking for assistance filing a "civil servant complaint" because he felt nothing was being done by Aldridge and other Jail administrators about the February 10 use-of-force incident, and as a result, he did not feel safe in the Jail. ECF No. 271 – 2 at 36.

February 24, 2011, McKelvey formally grieved to Aldridge about two matters. First, McKelvey complained that a correctional officer took food from his lunch tray and gave it to another inmate, without replacing the food, and that his request to speak to a shift supervisor about the incident was ignored until McKelvey kicked his door for twenty minutes, which only resulted in McKelvey being written up. *Id.* Without any indication that he investigated the incident, Aldridge responded to the February 25 grievance, "I don't believe my staff is tampering with your food or treating you unfair[ly]. I will[,] however, house [you] in booking where I can monitor you via camera to ensure staff is treating you in the manner they have been trained." *Id.* Second, McKelvey grieved to Aldridge that he was still waiting on an investigation of the February 10 use-of-force incident, to which Aldridge responded, "[r]eports on incident were sent to Charleston for review. Nothing more can be done at this level." *Id.* at 34.

February 25, 2011, McKelvey grieved to Aldridge and others that during dinner, Officer Ryder, who committed the February 10 use-of-force incident, refused to serve McKelvey dinner, and later McKelvey received a cold bag lunch with a blank grievance form. *Id.* at 33. There is no

written documentation filed with this Court indicating how Aldridge directly responded to the February 25 grievance. Sometime before February 28, 2011, McKelvey communicated to Aldridge about the February 25 grievance. On February 28, McKelvey sent Aldridge a grievance about their communication, refuting, among other things, a statement by Aldridge that Aldridge had no reason to believe Ryder would tamper with McKelvey's dinner. Aldridge responded to the February 28 grievance by letter dated March 1, 2011. *Id.* at 31. In his March 1 letter, Aldridge addressed McKelvey's concern about Jail administrators' responses to his grievances by saying it was "unfortunate" that McKelvey did not like the answers given to him. *Id.* Aldridge went on to say, "lately it appears that I spend much of my time researching and answering false allegations[.] [I]f you have a legitimate concern or problem[,] I will be glad to address your problem, however if you continue to send false allegations to my office[,] I will start writing you up for falsification of information." *Id.*

In March 2011 McKelvey wrote several inmate grievances to Aldridge. In one grievance, McKelvey complained about an incident where two correctional officers allegedly farted on him and called him a racial slur. In turn, Aldridge forwarded McKelvey's grievance to the shift supervisor for response. *Id.* There is no further documentation on record with this Court as to how or whether this incident was resolved. March 10, 2011, McKelvey complained to Aldridge that his previous grievances were being read by the correctional officers, which McKelvey alleged was in violation of the inmate handbook. ECF No. 271–2 at 23. Aldridge responded the correctional officers read grievances because "they have to know who they are addressed to. Have A Nice day." *Id.*[4]

---

[4] Because Aldridge had not ever included such a send-off in previous responses, a reasonable juror could view Aldridge's "have a nice day" remark as sarcastic, callous, or demeaning.

On April 14, 2011, McKelvey grieved to Aldridge and another administrator that two correctional officers had threatened him on separate occasions that same day. ECF No. 721–2 at 20. In both situations, officers said something to the effect of "you're not on camera, nobody can see me." *Id.* In this grievance, McKelvey told Aldridge he did not feel safe and requested a meeting with Aldridge or the other administrator. *Id.* McKelvey received a response to his grievance, apparently not from Aldridge, stating "[m]y staff would not do something as unprofessional as you are stating" *Id.*

August 3, 2011, McKelvey grieved to Aldridge, asking if he could speak with Aldridge about an incident where another inmate was assaulted by Officer Ryder in McKelvey's presence. ECF No. 721–2 at 19. After the alleged assault, another officer told McKelvey to "shut up, or you will be next." *Id.* Ryder chimed in, saying "I already beat his ass." *Id.* Aldridge responded by referring the August 3 grievance to a sergeant, who had a corporal speak with McKelvey about the incident. On August 8, 2011, McKelvey filed another grievance seeking a conversation with Aldridge, to which Aldridge responded he had spoken to the corporal about the corporal's conversation with McKelvey. ECF No. 721–2 at 18. Other than this, the record is silent regarding any other action Aldridge took in response to McKelvey's August 3 grievance.

August 8, 2011, McKelvey sent Aldridge a grievance that recounted an incident where correctional officers again used force against McKelvey. ECF No. 721–2 at 16. According to the August 8 grievance, officers punched and kicked McKelvey while he was on the ground because he had pulled his cheek off the wall during a pat-down. *Id.* While the officers kicked and punched McKelvey, another officer sprayed mace on McKelvey's face, grabbed McKelvey's face, and rubbed the mace around. *Id.* The officers who kicked and punched McKelvey taunted him, "there[,] do you like that?" *Id.* To the August 8 grievance, Aldridge responded on August 9, 2011, saying

-15-

"I have read incident reports and spoke[n] with Corporal Stiltner[, an officer involved,] and his account of incident is different from yours. I will however look into your allegations. *Id.* at 16–17. McKelvey replied to Aldridge by submitting a second grievance to him, this one dated August 9, 2011. *Id.* at 14. The August 9 grievance states:

> You are trying to justify your [correctional officers] and you have no idea as to the facts surrounding this incident. The officers assaulted me . . . [Corporal] Stiltner maced me and stood by as [correctional officers] continued to kick me. . . I don't understand how "your" officers can put their hands on me [with] no consequence.

*Id.* Aldridge answered McKelvey's August 9 grievance by writing:

> Staff wouldn't have to . . . 'put their hands on you' if you would follow the rules . . . . This is not the first time I have told you to follow the rules . . . and you wouldn't have any problems with staff. Obviously[,] you chose not to listen to me during our last conversation."

*Id.* at 15. On August 11, 2011, McKelvey wrote a third grievance to Aldridge about the August 8, 2011 use-of-force incident, asking what Aldridge was doing about the incident. *Id. at 13.* McKelvey reminded Aldridge he had received no response to the August 3 grievance about another inmate getting assaulted. *Id.* McKelvey added he felt correctional officers were targeting him and they had a "personal vendetta" against him. *Id.* As a result, McKelvey said he felt unsafe. *Id.* Aldridge answered McKelvey's August 11 grievance by stating:

> You are one of 600 inmates in [the] facility. Staff [are] too busy to have "personal vendetta[s]" against you. You draw attention to yourself by not following rules and regulations. Copies of incident reports have been sent to WVSP and I will be sending copies of this along with other grievances written to Central Office.

*Id.* From the record, it is unclear whether Aldridge ever performed on his promise to look into McKelvey's allegations about the August 8 use-of-force incident. Instead, his responses to McKelvey's grievances about the August 8 use-of-force incident indicate Aldridge relied on

reports of officers involved, attempted to rationalize officers' conduct to McKelvey, and chastised McKelvey for rule breaking—rule breaking which McKelvey denied.

Lastly, McKelvey submitted a series of grievances to Aldridge surrounding correctional officers' use of force against him on September 11, 2011, the third time McKelvey grieved to Aldridge that officers used allegedly unnecessary force against him. In a September 11, 2011 grievance to Aldridge and another administrator, McKelvey recounted that Officer Blankenship, after serving McKelvey dinner, grabbed McKelvey's arm as if to escort him back to his cell, and then twisted the arm to take McKelvey to the ground. ECF No. 721–2 at 10. While McKelvey was on the ground stomach-first, Blankenship started kneeing McKelvey in the ribs. It is unclear from the record if Aldridge responded directly to this grievance. *Id.* On September 14, 2011, McKelvey grieved a second time to Aldridge about the September 11 use-of-force incident, saying he would like to know about the incident, which resulted in him chipping two teeth and getting four stitches. *Id.* at 5. McKelvey also reported that officers were continuing to come to McKelvey's cell to antagonize him. *Id.* To McKelvey's September 14 grievance, Aldridge responded:

> [B]y keeping you in holding I can assure you don't make allegations against staff. . . Your inability to obey rules . . . [and] constant allegations against staff make it impossible to house you anywhere that you are not on video surveillance. . . I am aware of incident in which you were injured, if you would only follow rules and regulations of the facility you wouldn't be involved in needless altercation[s] with staff.

*Id.* at 6. Undeterred by Aldridge's brush-off, McKelvey grieved a third time to Aldridge, on September 21, 2011, asking, "what is being done about the assault . . . on September 11, 2011, where I lost teeth and received stitches?" *Id.* at 4. Two days later, Aldridge responded, "You have a public defender that can help you with your pursuit of charges against correctional staff, I was told that you tried to speak to a trooper in booking and they refused to take your statement." *Id.* Sometime after this, in an undated grievance, McKelvey asked Aldridge to tell his staff to stop

antagonizing him. *Id.* at 3. McKelvey explained that for two weeks Aldridge's staff came to McKelvey's cell to make faces at him, pester him, point at their teeth mockingly, make comments about McKelvey's lip having stitches. *Id.* One officer in particular would bang on the door with his key and make "racial comments." *Id.* McKelvey also asked if Aldridge mailed to the Authority the incident report from the September 11 use-of-force against him. On September 26, 2011, Aldridge responded to McKelvey's grievance only with, "I will keep an eye on this." *Id.*

In objecting to the Magistrate Judge's recommendation on his summary judgment motion, Aldridge asserts McKelvey has not produced evidence that Aldridge was deliberately indifferent. Obj. at 4. Aldridge points out there is a difference between documented widespread abuses, which is required to demonstrate the deliberate indifference necessary for a Section 1983 supervisory liability claim, and documented complaints by inmates, which McKelvey has produced in support of his claim against Aldridge. *Id.* Aldridge goes on, saying McKelvey's grievances do not establish any constitutional violations ever occurred, and McKelvey asks the Court to "second guess" Aldridge's assessment of McKelvey's grievances. *Id.*

Aldridge's argument for rejecting the Magistrate Judge's findings on the deliberate indifference prong is misguided for two reasons. First, while Aldridge may be correct that inmate complaints, on their own, are not conclusive evidence of civil rights violations, the deliberate indifference prong does not require that prisoners submit to the supervisor evidence showing the abuses were in fact constitutional violations. A prison supervisor may exhibit deliberate indifference by repeatedly not investigating actions of subordinates that pose an "unreasonable risk of constitutional injury." *See Shaw*, 13 F.3d at 799 (citing *Slakan*, 737 F.2d at 373); *id.* at n.12 (observing that showing a pervasive and unreasonable risk of harm is also necessarily a component of establishing deliberate indifference) (citation omitted). "Establishing a 'pervasive' and

'unreasonable' risk of [constitutional injury] requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the subordinate's conduct poses an unreasonable risk of . . . constitutional injury." *Id.* (citing *Slakan*, 737 F.2d at 373). McKelvey's grievances and deposition testimony, although not conclusive evidence of civil rights violations, must be taken as true for purposes of summary judgment, and the grievances and testimony are themselves evidence of the requisite constitutional injures. *See, e.g.*, *Gandy v. Robey*, 520 F. App'x 134, 143 (4th Cir. 2013) (plaintiff's supervisory liability claim failed because she failed to identify *any* evidence she proffered to support her claim). Testimony from a non-moving party who is an inmate, like testimony from any other non-moving party, is entitled to a presumption of truth on a motion for summary judgment. Furthermore, without the benefit of investigations by Aldridge or the Authority, how else, other than by their own personal testimony, would McKelvey or any other inmate present to the supervisor evidence of the abuses? Complaints and grievances by McKelvey in February, August, and September 2011 alleged that officers had used excessive force against him. These instances of excessive force are not the sort of random, unrelated incidents that the Fourth Circuit has found insufficient to impute liability to supervising officials. *See Cilman v. Reeves*, No. 06-1099, 2007 WL 1815548, at *5 (E.D. Va. June 20, 2007) *aff'd in part, appeal dismissed in part on other grounds*, 266 F. App'x 270 (4th Cir. 2008) (citing *Shaw*, 13 F.3d at 798) (two unrelated incidents was not conduct sufficiently widespread or perpetrated on several different occasions, at least for purposes of supervisory liability claim). Thus, based on McKelvey's grievances and complaints, Aldridge was faced several times with evidence that his subordinates had taken actions posing an unreasonable risk of constitutional injury.

Second, McKelvey does not ask the Court to second-guess Aldridge's assessments of McKelvey's grievances; he asks the Court to find Aldridge, by his responses to those grievances,

exhibited deliberate indifference. And the Court concludes a reasonable juror could find Aldridge's responses to McKelvey's grievances amounted to deliberate indifference. McKelvey has produced evidence that throughout 2011 Aldridge was faced with mounting complaints and grievances about his subordinate officers' abusive conduct toward inmates, including McKelvey—who told Aldridge multiple times that he felt unsafe around Aldridge's subordinate officers. ECF No. 271–2 at 13, 20, 36. And Aldridge's response was to: credit the reports of his subordinates over complaints of inmates, without personally investigating incidents beyond having conversations with officers; promise personal investigations and fail to follow-up on these promises; send incident reports up the chain of command and claim he could do nothing more; allow allegedly abusive officers to read complaints submitted by inmates and permit those officers access to complaining inmates; attempt to rationalize his subordinates' conduct to inmates; shift the blame back to inmate rule breaking; and threaten inmates with write-ups for falsification of information. Aldridge's response to these complaints did not ensure McKelvey and other inmates' safety from potentially abusive correctional officers during the Authority's investigation. Rather, to ensure inmates were safeguarded from allegedly abusive officers, Aldridge could have prohibited those officers from interacting with McKelvey or placed the officers in different parts of the Jail while either he personally investigated matters[5] or during the Authority's investigation.[6] A reasonable juror could conclude that Aldridge's responses—such as never personally investigating

---

[5] By investigate, the Court means do more than simply rely on the reports of his subordinate officers about alleged excessive force incidents committed by those officers.

[6] As the Magistrate Judge keenly noted, Aldridge, after receiving McKelvey's February and August complaints of excessive force, could have taken a number of corrective actions, all better designed to ensure McKelvey's safety. Aldridge could have prohibited officers accused of threatening or using excessive force from interacting with McKelvey, required those officers to record interactions with McKelvey (making it less necessary to hold McKelvey in booking where surveillance was available), or counseled those officers on their use of force. PF&R at 59. However, there is no evidence that Aldridge did any of this.

McKelvey's complaints of excessive force, permitting allegedly abusive correctional officers to read McKelvey's grievances, and then giving those officers unfettered access to McKelvey during the Authority's investigation of McKelvey's complaints—exhibited deliberate indifference to the alleged constitutional abuses performed by Aldridge's subordinate correctional officers. *See Shaw*, 13 F.3d at 800 (finding deliberate indifference based on supervisor's failure to respond to three witnesses' reports of abuse, and where supervisor knew only that subordinate had "possibly" roughed up individual); *Smith v. Ray*, 409 F. App'x 641, 650 (4th Cir. 2011) (finding no deliberate indifference because supervisor had ordered investigations). As the Magistrate Judge insightfully observed, "[w]here grievances are one of the few avenues available for an inmate to vindicate his constitutional rights, the administration's failure to appropriately address and investigate those grievances should not be brushed aside." PF&R at 59.

In sum, based on the evidence McKelvey presented during his deposition and in his grievances, a reasonable juror could conclude that Aldridge was deliberately indifferent by, among other actions and inactions, never personally investigating McKelvey's complaints of excessive force, permitting allegedly abusive correctional officers to read McKelvey's grievances, and then giving those officers unfettered access to McKelvey during an outside agency's investigation of the abuses. Because Aldridge contests McKelvey's evidence, a fact issue remains on the Section 1983 supervisory liability claim. Accordingly, the Court adopts the Magistrate Judge's recommendation and finds summary judgment on this ground is inappropriate.

### 3.  Aldridge is not entitled to Qualified Immunity

Lastly, Aldridge claims he is entitled to qualified immunity from McKelvey's Section 1983 supervisory liability claim because his challenged conduct was discretionary and he violated no clearly established law.[7]  The Court finds Aldridge is not immune.

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is "an immunity from suit rather than a mere defense to liability," as such, "it is effectively lost if a case is erroneously permitted to go to trial"; and so, the qualified immunity question should be resolved at the "earliest possible stage in litigation." *Saucier v. Katz*, 533 U.S. 194, 200–01 (2001). In *Saucier*, the Supreme Court set forth a two-step analysis for resolving qualified immunity claims: First, a court must decide whether the facts that a plaintiff has alleged[8] or shown,[9] taken in a light most favorable to the plaintiff, make out a violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier*, 533 U.S. at 201). Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Id.* (citing *Saucier*, 533 U.S. at 201). While the sequence *Saucier* set forth is often appropriate, it is not mandatory; judges have discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first, in light of the

---

[7]  Aldridge cites West Virginia law to demonstrate that his actions were discretionary in nature, and not ministerial.

[8]  If immunity is raised on motion to dismiss, courts apply the reviewing standards for deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Pearson*, 555 U.S. at 232.

[9]  If immunity is raised on motion for summary judgment, courts apply the reviewing standards for deciding a motion for summary judgment under Federal Rules of Civil Procedure 50 and 56. *Pearson*, 555 U.S. at 232.

circumstances in the particular case at hand. *Id.* at 236. As a final matter, "[q]ualified immunity is intended to protect those officers who reasonably believe that their actions do not violate federal law, but it should not function to give officers one free violation of constitutional rights every time they are asked to apply a well-established principle to a new set of facts." *Trulock v. Freeh*, 275 F.3d 391, 412 (4th Cir. 2001) (Michael, J. concurring and dissenting) (internal quotations and citations omitted).

Furthermore, in *Shaw v. Stroud* the Fourth Circuit held that plaintiffs asserting Section 1983 supervisory liability claims must make several separate showings to demonstrate a government defendant lacked qualified immunity: (1) it was "clearly established" at the time of the subordinate's conduct that the defendant could be held liable under Section 1983 for constitutional violations committed by the subordinate; (2) it was "clearly established" at the time the defendant was supervising the subordinate that the degree of force the defendant knew the subordinate was using was unconstitutional; (3) a reasonable person in the defendant's position would have known his or her actions were unlawful. 13 F.3d 791, 801 (4th Cir. 1994). Because *Shaw's* analytical framework entails the *Saucier* two-step inquiry, the Court exercises its discretion pursuant to *Pearson* to employ the *Saucier* steps in the framework laid out by the Fourth Circuit in *Shaw*.

Here, the Magistrate Judge correctly found McKelvey offered evidence, which if true, refutes Aldridge's qualified immunity defense. Under the first *Shaw* prong, it was clearly established at the time of the subordinate correctional officer's conduct that Aldridge could be held liable under Section 1983 for the constitutional violations of his subordinate officers. In *Shaw* the Fourth Circuit held that Section 1983 supervisory liability for deliberate indifference or tacit authorization claims had been established since 1984 in *Slakan*. *Id.* at 802.

Under *Shaw's* second prong, it was clearly established at the time Aldridge supervised the allegedly abusive correctional officers that the degree of force Aldridge knew the officers used was unconstitutional. *See id.* (defendant knew use of significant force against unarmed arrestees who did not pose a significant risk of harm to officer or anyone else was unconstitutional); *see also Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir. 2013) (holding blow to head of a detainee in response to mere insulting words and noncompliance with orders was excessive).

Under *Shaw's* third prong, a reasonable person in Aldridge's position would have known a supervisor's repeated inaction to mounting excessive force complaints about subordinates violated the contours of Section 1983 supervisory liability. *See Shaw*, 13 F.3d at 802 (supervisor received complaints about excessive force and, in response, laughed and ignored them); *See also Carter v. Barker*, 225 F.3d 653 (4th Cir. 2000) (unpublished) (holding reasonable person in defendant's position would have known his actions were deliberately indifferent when: defendant, although aware of plaintiff's allegations of harassment, took no action other than to hold a meeting at which he allowed the subordinate-harasser to speak; plaintiff was assaulted again later and informed defendant of such; defendant responded that he would arrange a taping session—which fell through; and defendant took no further action until he held a meeting where he allowed subordinate to harass and intimidate plaintiff). Although Aldridge read and offered some response to McKelvey's grievances, and although he sent incident reports up the chain of command, a reasonable person in his position would have known this was not enough to avoid supervisory liability under Section 1983 for subordinates' very likely continued constitutional violations. By permitting allegedly abusive correctional officers to read McKelvey's complaints and allowing them unfettered access to McKelvey, Aldridge effectively ignored McKelvey's grievance requests where he espoused fear for his personal safety, which could be reasonably read as requests to be

-24-

isolated from those abusive correctional officers. *See* ECF No. 271–2 at 13, 20. Additionally, Aldridge's responses to McKelvey's repeated grievances were mocking and belittling in a manner similar to the supervisor in *Shaw*, who laughed at arrestee's complaints.[10]  Applying *Shaw*, which includes the requisite elements of *Saucier*'s analysis, Aldridge is not entitled to qualified immunity from McKelvey's Section 1983 supervisory liability claim.

In raising the qualified immunity defense, Aldridge characterizes McKelvey's supervisory liability claim as contending Aldridge should not have allowed allegedly abusive officers to remain in their positions as correctional officers. Obj. at 4. Aldridge's characterization is incorrect. Other than completely removing the allegedly abusive officers from their positions, Aldridge had several options he could have employed to respond effectively to McKelvey's grievances and excessive force complaints, but he employed none of them. As the supervisory liability analysis above makes clear, Aldridge could have prohibited allegedly abusive correctional officers from interacting with McKelvey or placed them in parts of the Jail away from McKelvey. These two responses would have ensured McKelvey was safeguarded from those officers during the Authority's investigation. Because Aldridge did not employ either of these two remedies, or other appropriate options recommended by the Magistrate Judge, the correctional officers had unfettered access to McKelvey, and that access was even more egregious after Aldridge added fuel to the fire by permitting officers to read McKelvey's grievances.

---

[10]  At one point, Aldridge wrote "have a nice day" at the end of a particularly brief response to McKelvey's grievance about officers reading his earlier complaints and responding abusively. *See* ECF No. 271–2 at 23. As mentioned earlier, Aldridge's unprecedented sign-off could be viewed by a reasonable juror as sarcastic, callous, or demeaning.

In sum, Aldridge does not enjoy qualified immunity from McKelvey's Section 1983 supervisory liability claim, and therefore, the Court adopts the Magistrate Judge's recommendation and Aldridge's motion for summary judgment based on qualified immunity is denied.

### C.   Motion for Summary Judgment by Gilkerson

Lastly, Gilkerson disputes the Magistrate Judge's recommended finding that sufficient evidence exists to defeat a motion for summary judgment on the excessive force claim against him. In his objection, Gilkerson asserts McKelvey has offered insufficient evidence that Gilkerson was even present during the September 11, 2011 events giving rise to this cause of action. To prove Gilkerson was present, McKelvey offers his deposition testimony.[11] Some documentary evidence submitted by Defendants undermines the likelihood that Gilkerson was present as McKelvey alleges. Specifically, a log signed every fifteen minutes indicates Gilkerson was in another part of the Jail on suicide watch for other prisoners, and therefore was not present during the alleged constitutional violations. Additionally, incident reports filed by other officers neglect to mention Gilkerson's presence during the events. According to Gilkerson, McKelvey does not offer any objective evidence to dispute these pieces of documentary evidence, and a "self-serving" deposition cannot, without objective corroborating evidence, defeat summary judgment when documentary evidence contradicts the self-serving deposition evidence. Obj. at 7.

---

[11]  In his complaint, McKelvey alleges that Gilkerson kicked him and sprayed him with mace "on [his] backside" after he was slammed to the ground during the escort to medical. ECF No. 3 at 6. In his deposition, McKelvey testified that he saw Gilkerson during the escort to the medical unit and heard Gilkerson call him profane names and racial slurs. McKelvey Dep. at 104-05. McKelvey also testified that during the escort Gilkerson kicked him and was in possession of a can of mace, although McKelvey was uncertain whether Gilkerson was the one who maced him during the escort. *Id.* at 105. In his response brief, McKelvey asserts that Gilkerson would have been quick to respond to an officer assistance call in pod A because Gilkerson was stationed in pod F, which is closest to pod A. ECF No. 266 at 2. McKelvey insists that he saw Gilkerson in the hallway after he was slammed to the floor and that he observed Gilkerson kick him thereafter. *Id.* at 5.

The Magistrate Judge considered and properly rejected Gilkerson's arguments that his evidence—a log and incident reports—blatantly contradict Mr. McKelvey's deposition testimony. PF&R at 51–53. "Where a witness's deposition testimony 'is blatantly contradicted by the record, so that no reasonable jury could believe it,' an alleged factual dispute created by the testimony need not be credited and 'will not defeat an otherwise properly supported motion for summary judgment.'" *Hodges v. Fed.-Mogul Corp.*, 621 F. App'x 735, 741 (4th Cir. 2015) (quoting and citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Notably, the Fourth Circuit has not applied *Scott* beyond the context of blatantly contradictory video evidence. *See, e.g.*, *Walters v. Prince George's Cty., Md.*, 438 F. App'x 208, 210 (4th Cir. 2011).

Simply put, Defendants have not offered evidence blatantly contradicting McKelvey's deposition testimony that Gilkerson participated in some of the September 11, 2011 events giving rise to this cause of action. First, consider documentary evidence in the form of a log, here a suicide watch log. The Magistrate Judge noted that Gilkerson was on suicide watch in the pod closest to the pod where officers called for assistance, making it possible for Gilkerson to report quickly to the all-call for officer help, participate as McKelvey says—by macing and kicking him—actions taking only a few seconds during a brief scuffle, and then return either in time to initial the log before fifteen minutes had elapsed or not long after it elapsed. Thus, the log indicating Gilkerson was on suicide watch does not contradict Mr. McKelvey's testimony that Gilkerson participated in the abuses. More fundamentally, an initial on a log, unlike authenticated video evidence, cannot blatantly contradict deposition testimony or render it untrue. *See Witt v. W. Va. St. Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) ("*Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of events."); *see also Hodges*, 621 F. App'x at 741

-27-

(finding genuine issue of fact remained because evidence supporting summary judgment did not make testimony "physically impossible"). Gilkerson's initial on the log constitutes his word that he was unceasingly present in that part of the jail, and it is offered to disprove McKelvey's word that Gilkerson briefly stepped away from his suicide watch duties to respond to the officer assistance call. One person's word cannot make another person's word physically impossible the same way that video evidence can make a person's word physically impossible. A jury is entitled to weigh Gilkerson's testimony in the form of his initials against Mr. McKelvey's testimony in his deposition. Because the initial on the log is officer Gilkerson's testimony against McKelvey's testimony, a reasonable jury could find that although Gilkerson initialed the suicide watch log every fifteen minutes from 12:15 p.m. to 4:15 p.m. on September 11, 2011, Gilkerson nevertheless was present for some of the alleged constitutional violations during that time. *See Parker v. Stevenson*, 625 F. App'x 196, 199 (4th Cir. 2015) (recognizing that although several pieces of evidence offered by defendants may significantly draw into question a plaintiff's allegations, a district court may only discount evidence offered by a nonmoving party in support of his allegations if the moving party's evidence blatantly contradicts the non-moving party's evidence).

Next, consider the incident reports omitting mention of Gilkerson. Several reports were generated as a result of the September 11, 2011 incident, none mention Gilkerson was present. Some reports were quite brief, others were lengthier, all describe the events somewhat differently. As the Magistrate Judge noted, it is possible the report writing officers either simply forgot to mention Gilkerson in their reports or they did not notice his presence during the transport. PF&R at 52. Given Gilkerson's alleged involvement was relatively brief and minor, it is more than likely that officers would omit from their reports the role Gilkerson played in regaining control over

McKelvey during the medical unit escort.[12] Furthermore, the reports do not consistently list the officers who were present during the events; some reports mention officers who are omitted in other reports.[13] Lastly, just like initials on a log, the incident reports, although evidence in the form of documents, are merely the correctional officers' written words offered to disprove Mr. McKelvey's word given during his oral deposition. Unlike videotape evidence, incident reports written by correctional officers after-the-fact cannot blatantly contradict deposition testimony or render it untrue. *See Parker*, 625 F. App'x at 199 (evidence merely calling into question the allegations does not blatantly contradict non-moving party's evidence supporting allegations); *Hodges*, 621 F. App'x at 741 (to be blatantly contradictory, evidence must make non-moving party's evidence "physically impossible"); *Witt*, 633 F.3d at 276 (documentary evidence that only offers some support for a governmental officer's version of events is not enough to blatantly contradict non-moving party's evidence). Taking the incident reports as conclusive evidence on the issue of Gilkerson's presence during the alleged constitutional violations would be similar to taking written deposition testimony under Rule 31 as conclusive to disprove oral deposition testimony under Rule 30. That would be simply erroneous. On the contrary, a jury is entitled to

---

[12] Evidence shows there were at least seven officers, other than Gilkerson, involved in the incident on September 11, 2011, and McKelvey states Gilkerson was only involved long enough to mace, kick, and issue racial slurs at one point during the whole series of events. PF&R at 5–7.

[13] *Compare* Chapman's report (mentioning seven officers directly involved—Harshbarger, Kelly, Jones, Carter, Coffey, Stephens, and Farrell), *with* Harshbarger's report (mentioning four officers involved—Harshbarger, Stephens, Carter, and Coffey; omitting Kelly, Jones, and Farrell), *with* Kelly's report (mentioning two officers by name—Harshbarger and Kelly; omitting names of other officers involved), *with* Carter's Report (mentioning five officers involved—Harshbarger, Kelly, Carter, Farrell, Coffey; omitting Stephens and Jones), *with* Coffey's report (mentioning four officers involved—Harshbarger, Kelly, Carter, Coffey; omitting Stephens, Jones, and Farrell), *with* Jones's report (mentioning four officers involved—Harshbarger, Carter, Jones, Farrell; omitting Kelly, Coffey, and Stephens), *with* Stephens's Report (mentioning four officers by name—Harshbarger, Kelly, Farrell, and Stephens; omitting names of other officers involved), *with* Farrell's report (mentioning three officers by name—Harshbarger, Stephens, Farrell; omitting names of other officers involved). PF&R at 7–11.

weigh the officers' testimony in the form of their incident reports' omission against Mr. McKelvey's testimony in his deposition.

Because McKelvey's deposition testimony that Gilkerson was involved in the September 11, 2011 use-of-force incident is not blatantly contradicted by the documentary evidence submitted, the Court adopts the Magistrate Judge's recommendation and Gilkerson's motion for summary judgment is denied.

### V. Conclusion

For the reasons above, the Court **OVERRULES** Defendants' objections, **ACCEPTS** and **INCORPORATES** the findings and recommendation of the Magistrate Judge and **ORDERS:**

1. The Motion for Summary Judgment filed by WRJ, ECF No. 221, is **GRANTED**, and Plaintiff's claim against WRJ is **DISMISSED** with prejudice;

2. The Motions for Summary Judgment filed by Defendants Harshbarger, Kelly, Blankenship, Gilkerson, Carter, Farrell, Jones, and Stephens, ECF Nos. 211, 213, 217, 219, is **GRANTED**, in part, and **DENIED**, in part. Plaintiff's claims against these defendants in their official capacities are **DISMISSED**, as the Eleventh Amendment immunizes these defendants from suit in their official capacities. However, Plaintiff's excessive force claims against these defendants in their personal capacities remain;

3. The Motion for Summary Judgment filed by Defendant Aldridge, ECF No. 215, is **GRANTED**, in part, and **DENIED**, in part. Plaintiff's claims against Aldridge in his official capacity are **DISMISSED**, as the Eleventh Amendment immunizes him from suit in his official capacity. However, Plaintiff's supervisory liability claim against Aldridge in his personal capacity remains;

4. Plaintiff's claims against Administrator Clark and Coffey are **DISMISSED** without prejudice;

5. Following entry of this Order, the Court will issue a scheduling order with dates for the pretrial conference and trial.

The Court **DIRECTS** the Clerk to forward copies of this written opinion and order to all counsel of record, and any unrepresented parties.

ENTER:        March 21, 2016

-30-        ROBERT C. CHAMBERS, CHIEF JUDGE